AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

~~UNDER SEAL~~

for the

Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>**EDUARDO ALFONSO**<br>**VIERA-CHIRINOS (a/k/a "Rojo") et al**<br>(see attachment for all defendants)<br><br>_____<br>_Defendant(s)_ | )<br>)<br>)  Case No.<br>)<br>)<br>)<br>) |

FILED

JUL 29 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

3  19  71145

TSH

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on a date  unknown, but no later than 3/4/19, through the present,  in the counties of San Francisco and Alameda  in the

Northern  District of  California  , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) | Conspiracy to Distribute Controlled Substances |

This criminal complaint is based on these facts:

See attached Affidavit of DEA Special Agent Eric J. Diamond.

☑ Continued on the attached sheet.

Approved as to form _Julie D. Garcia_
AUSA Julie D. Garcia

_____
_Complainant's signature_

Eric J. Diamond, DEA Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  July 26, 2019

City and state:  San Francisco, California

_____
_Judge's signature_

Hon. Thomas S. Hixson, U.S. Magistrate Judge
_Printed name and title_

1

2

3

4

5

6                           UNITED STATES DISTRICT COURT

7                         NORTHERN DISTRICT OF CALIFORNIA

8                            SAN FRANCISCO DIVISION

9

UNITED STATES OF AMERICA,          )   CRIMINAL COMPLAINT
10                                         )
          Plaintiff,                       )
11                                         )
          v.                               )
12                                         )
EDUARDO ALFONSO VIERA-CHIRINOS             )
13        a/k/a "Rojo";                     )
VICTOR VIERA-CHIRINOS                       )
14        a/k/a "Mojarra";                  )
JORGE ALBERTO VIERA-CHIRINOS;              )
15    JORGE ENRIQUE TORRES-VIERA            )
          a/k/a "Enrique";                  )
16    KAREN CASTRO-TORRES                   )
          a/k/a "Delany Ellieth Cardona     )
17              Velasquez"                   )
          a/k/a "Belanie Elyzabeth Artiaga";)
18    CILDER VELASQUEZ                       )
          a/k/a "Cilder Gamez";             )
19    ALEXANDER GONZALEZ-VASQUEZ            )
          a/k/a "Ale";                      )
20    GAMEZ VELASQUEZ                        )
          a/k/a "Bomba"; and               )
21    LUIS ALMICAR ERAZO-CENTENO            )
          a/k/a "Pika,"                      )
22                                         )
          Defendants.                       )
23                                         )
                                           )
24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................4

RELEVANT STATUTES ............................................................................5

BACKGROUND OF INVESTIGATING AGENT.......................................5

STATEMENT OF PROBABLE CAUSE......................................................8

I.      Overview of Investigation Relevant to the Target Subjects ...............8

II.     Initiation of Investigation................................................................10

    A.      The DEA's investigation began in fall 2017, when confidential sources and an undercover officer made controlled purchases of heroin from Individual 2. ..........................................................................10

    B.      In June 2018, SFPD and RPD seized more than 5 pounds of drugs and $72,000 in cash from a residence associated with EDUARDO and KAREN.....................................................................................11

    C.      Phones seized during the search warrants had been in contact with Individual 2. ............................................................................13

III.    Identification of CILDER as a source of supply to Individual 2 .....13

    A.      Individual 2 explained to the UC which code words to use for which drugs.....................................................................................13

    B.      Agents identified CILDER as a source of supply to Individual 2. ......15

IV.     Identification of ENRIQUE and JORGE as members of the same DTO as CILDER .......................................................................................17

    A.      CILDER was working with ENRIQUE, who appeared to be in a position of authority over CILDER. .......................................17

    B.      CILDER also worked with JORGE. .......................................20

V.      Identification of the Viera DTO's use of "redistributor houses".....21

    A.      Calls intercepted over CILDER's phone suggested that he was delivering drugs to multiple individuals living together at several residences...............................................................................21

    B.      Other calls showed that the Viera DTO subleasing "redistributor houses" to the street-level dealers it employed....................................24

    C.      Starting around March 20, 2019, the Viera DTO began using the Santa Clara Street House as one of its redistributor houses. ....................32

D. On most days, CILDER travels to the redistributor houses and resupplies the street-level dealers living there with distribution quantities of drugs.................................................................34

VI. EDUARDO's return to the San Francisco Bay Area.........................41

A. In or about June 2019, EDUARDO returned to the San Francisco Bay Area to continue operating the DTO.....................................................41

B. On June 4, 2019, DEA intercepted calls involving ENRIQUE, EDUARDO, and a Mexico-based number about drugs arriving into the Bay Area. ................................................................................42

C. On the same day, ENRIQUE, KAREN, and CILDER discussed drug distributors' preferences about living arrangements and KAREN's role in coordinating the housing................................................................46

D. The next day, June 5, 2019, ENRIQUE and UM-5228 coordinated new housing for street-level dealers on Martin Luther King Jr. Way in Oakland. ..............................................................................53

E. On June 21, 2019, CILDER, EDUARDO, and VICTOR arranged a delivery of drugs. ................................................................55

VII. Threats of violence and use of firearms .............................................61

A. In May 2019, JORGE bought at least one firearm that he intended to use in connection with his drug trafficking...........................................61

B. In July 2019, EDUARDO discussed guns with someone in Honduras and then asked that person to murder someone in that country...........66

VIII. Seizure of suspected cocaine and heroin from EDUARDO and GONZALEZ ...........................................................................................74

A. On July 17, 2019, EDUARDO traveled to Los Angeles to buy drugs..................................................................................74

B. On July 19, 2019, EDUARDO directed ENRIQUE to collect drug proceeds in the Seattle and drive them to the San Francisco Bay Area.....................................................................................79

C. On July 20, 2019, ENRIQUE and GONZALEZ drove the drug proceeds from the Seattle area to Livermore. ......................................84

D. In the early morning on July 21, 2019, EDUARDO, KAREN, and ENRIQUE moved from the Cherry Blossom House to a house in Tracy...................................................................................86

E. On July 22, 2019, officers seized more than 3,800 gross grams of suspected drugs from EDUARDO and GONZALEZ on their way to the Seattle area. ....................................................................88

F.   EDUARDO, ENRIQUE, KAREN, VICTOR, CILDER, JORGE, and
GONZALEZ reacted to the seizure. ...........................................89

CONCLUSION..............................................................................................94

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Eric J. Diamond, a Special Agent of the Drug Enforcement Administration (DEA), being sworn, hereby declare as follows:

## INTRODUCTION

1.      I submit this Affidavit in support of an application for a criminal complaint charging the following persons (the "Target Subjects") with violations of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) (conspiracy to distribute and to possess with intent to distribute controlled substances) arising from their participation in a conspiracy to sell methamphetamine, cocaine, and heroin:

   a.   EDUARDO Alfonso Viera-Chirinos a/k/a "Rojo";

   b.   VICTOR Viera-Chirinos a/k/a "Mojarra";

   c.   JORGE Alberto Viera-Chirinos;

   d.   Jorge ENRIQUE Torres-Viera a/k/a "Enrique";

   e.   KAREN Castro-Torres a/k/a "Delany Ellieth Cardona Velasquez" a/k/a "Belanie Elyzabeth Artiaga";

   f.   CILDER Velasquez a/k/a "Cilder Gamez";

   g.   Alexander GONZALEZ-Vasquez a/k/a "Ale";

   h.   GAMEZ Velasquez a/k/a "Bomba"; and

   i.   Luis ALMICAR Erazo-Centeno a/k/a "Pika."

2.      The statements in this Affidavit are based on my own investigation; information from other law enforcement agents, investigators, and individuals with knowledge of this matter; my review of documents related to this investigation; and my training and experience as a DEA Special Agent.  This Affidavit does not purport to set forth all of the evidence gathered to date in this investigation, or to name all of the persons who participated in these crimes; I have included only those facts that I believe are necessary to establish probable cause for the requested criminal complaint and arrest warrants.

## RELEVANT STATUTES

3.        Under 21 U.S.C. § 841(a)(1), it is unlawful for a person to knowingly or intentionally manufacture, distribute, or possess with intent to distribute, controlled substances, including methamphetamine, its salts, isomers, and salts of its isomers; cocaine, its salts, optical and geometric isomers, and salts of isomers; and a mixture or substance containing a detectable amount of heroin.

4.        Under 21 U.S.C. § 846, it is unlawful for a person to attempt or conspire to manufacture, distribute, or possess with intent to distribute controlled substances.

## BACKGROUND OF INVESTIGATING AGENT

5.        I am employed by the United States Department of Justice, DEA, as a Special Agent ("SA") and have been so employed since September 2014. I am presently assigned to the Oakland Resident Office ("ORO") in California.

6.        I have received formal training at the DEA Training Center in Quantico, Virginia. This twenty-week DEA Basic Agent Academy included instruction on, among other things, basic narcotic investigations, drug identification, drug detection, familiarization with United States narcotics laws, money laundering techniques and schemes, identification and seizure of drug-related assets, undercover work, and physical and electronic surveillance operations. Prior to working for the DEA, I worked as a private attorney in California for approximately three and a half years and as an Attorney for the Orange County District Attorney's Office in Santa Ana, California, for approximately five months as part of the Trial Attorney Partnership ("TAP") Program. Prior to working as an attorney, I served as a Certified Law Clerk for the Orange County District Attorney's Office. In my capacity as a TAP Attorney and Certified Law Clerk, I received experience conducting misdemeanor jury trials and felony drug preliminary hearings.

7.        In addition to the above, I have spoken to and worked with more experienced federal and state narcotics agents and officers. During my tenure with the DEA, I have participated in numerous investigations of illicit drug trafficking organizations, ranging from street level dealers to major traffickers, and while assigned to the ORO, I have participated in

numerous investigations of illicit drug trafficking organizations and organized criminal enterprises in the Northern and Eastern Districts of California. The investigations have involved the use of confidential sources (CSs), wire and physical surveillance, telephone toll analysis, investigative interviews, and the service of search and arrest warrants. I have conducted investigations into unlawful possession with intent to distribute and distribution of controlled substances, laundering of monetary instruments, and the associated conspiracies involving such conduct. These investigations have included the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, conducting monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses, in violation of 21 U.S.C. §§ 841(a)(1) and 846, which have resulted in state and federal prosecutions of individuals who have possessed, smuggled, received, and/or distributed controlled substances including: cocaine, heroin, methamphetamine, prescription pills (including counterfeit), and fentanyl, as well as the seizure of those illegal drugs and proceeds from the sale of those illegal drugs.

8.     In conducting these investigations, I have employed a variety of investigative techniques, including physical and electronic surveillance, analysis of telephone records and pen register data, interviewing witnesses, service of search and arrest warrants, and the drafting of criminal complaints, as well as handling informants and cooperating sources. In the course of these investigations, I have, at various times, participated in, planned, and/or supervised numerous instances of physical surveillance and electronic surveillance. Moreover, I have directed informants and have monitored meetings and consensual telephone conversations involving undercover agents and informants. I have participated in over one hundred and fifty hours of surveillance of narcotics traffickers. During surveillance, I have personally observed narcotics transactions, counter-surveillance techniques, and the methods narcotics traffickers used to conduct clandestine meetings.

9.     I have participated in more than six investigations in which court-authorized Title III interceptions were used in narcotics and money laundering investigations. During these

investigations, I have listened to and deciphered conversations between narcotics traffickers in which they discussed their criminal activities in coded language or intentionally vague language and which were later corroborated by surveillance or defendants' statements, and I have participated in seizures of narcotics and narcotics proceeds that resulted from the monitoring of these types of conversations. I also have interviewed several drug traffickers after their arrest, as well as confidential sources, and discussed with them the meaning of their coded language used during the course of the commission of drug and money laundering offenses. During these interviews, the arrested drug traffickers and confidential sources have explained to me how they use coded language to conceal the true nature of their conversations from law enforcement and anyone who may be listening or overhear the conversation. As a result, a person who did not know the code or their meaning would think the individuals were having an innocent conversation or be confused by the conversation since it would not make sense to that person.

10.     In addition, I have participated in approximately two follow-up investigations concerning the concealment of assets, money, bank records, etc., and the identification of co-conspirators through the use of drug ledgers, telephone records and bills, photographs, and financial records.

11.     I have been involved in the execution of more than forty state and federal narcotics related search warrants. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances. I am familiar with the appearance of fentanyl, marijuana, heroin, cocaine, methamphetamine, and other controlled substances. I am familiar with and aware of the terminology used by illegal drug traffickers concerning narcotics and narcotics dealing.

12.     I have interviewed more than fifteen drug dealers, users, and confidential informants and have discussed with them the lifestyle, appearances, and habits of drug dealers and users. I have become familiar with the manner in which illegal drug traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT ~~UNDER SEAL~~

for the

Northern District of California

**FILED**

| | |
|---|---|
| United States of America<br>v.<br>EDUARDO ALFONSO<br>VIERA-CHIRINOS (a/k/a "Rojo") et al<br>(see attachment for all defendants) | )<br>)<br>)<br>)<br>)<br>) |

JUL 29 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

Case No.

**3  19  71145**

TSH

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on a date unknown, but no later than 3/4/19, through the present, in the counties of San Francisco and Alameda in the Northern District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) | Conspiracy to Distribute Controlled Substances |

This criminal complaint is based on these facts:

See attached Affidavit of DEA Special Agent Eric J. Diamond.

☑ Continued on the attached sheet.

Approved as to form _Julie D. Garcia_
AUSA Julie D. Garcia

_Complainant's signature_

Eric J. Diamond, DEA Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: _July 26, 2019_

_Judge's signature_

City and state:     San Francisco, California

Hon. Thomas S. Hixson, U.S. Magistrate Judge
_Printed name and title_



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>EDUARDO ALFONSO VIERA-CHIRINOS<br>　　　a/k/a "Rojo";<br>VICTOR VIERA-CHIRINOS<br>　　　a/k/a "Mojarra";<br>JORGE ALBERTO VIERA-CHIRINOS;<br>JORGE ENRIQUE TORRES-VIERA<br>　　　a/k/a "Enrique";<br>KAREN CASTRO-TORRES<br>　　　a/k/a "Delany Ellieth Cardona<br>　　　　　Velasquez"<br>　　　a/k/a "Belanie Elyzabeth Artiaga";<br>CILDER VELASQUEZ<br>　　　a/k/a "Cilder Gamez";<br>ALEXANDER GONZALEZ-VASQUEZ<br>　　　a/k/a "Ale";<br>GAMEZ VELASQUEZ<br>　　　a/k/a "Bomba"; and<br>LUIS ALMICAR ERAZO-CENTENO<br>　　　a/k/a "Pika,"<br><br>　　　Defendants. | CRIMINAL COMPLAINT |

## TABLE OF CONTENTS

INTRODUCTION .............................................................................4

RELEVANT STATUTES ...................................................................5

BACKGROUND OF INVESTIGATING AGENT.................................5

STATEMENT OF PROBABLE CAUSE..............................................8

I.      Overview of Investigation Relevant to the Target Subjects ...............8

II.     Initiation of Investigation...............................................................10

    A.      The DEA's investigation began in fall 2017, when confidential sources and an undercover officer made controlled purchases of heroin from Individual 2. ...................................................................10

    B.      In June 2018, SFPD and RPD seized more than 5 pounds of drugs and $72,000 in cash from a residence associated with EDUARDO and KAREN.............................................................................11

    C.      Phones seized during the search warrants had been in contact with Individual 2. ......................................................................13

III.    Identification of CILDER as a source of supply to Individual 2 .....................13

    A.      Individual 2 explained to the UC which code words to use for which drugs..................................................................................13

    B.      Agents identified CILDER as a source of supply to Individual 2. ......15

IV.     Identification of ENRIQUE and JORGE as members of the same DTO as CILDER .......................................................................................17

    A.      CILDER was working with ENRIQUE, who appeared to be in a position of authority over CILDER. ...................................................17

    B.      CILDER also worked with JORGE. ...................................................20

V.      Identification of the Viera DTO's use of "redistributor houses"......................21

    A.      Calls intercepted over CILDER's phone suggested that he was delivering drugs to multiple individuals living together at several residences...........................................................................21

    B.      Other calls showed that the Viera DTO subleasing "redistributor houses" to the street-level dealers it employed..........................24

    C.      Starting around March 20, 2019, the Viera DTO began using the Santa Clara Street House as one of its redistributor houses. ...........................32

    D.    On most days, CILDER travels to the redistributor houses and resupplies the street-level dealers living there with distribution quantities of drugs.................................................................34

VI.    EDUARDO's return to the San Francisco Bay Area........................................41

    A.    In or about June 2019, EDUARDO returned to the San Francisco Bay Area to continue operating the DTO......................................................41

    B.    On June 4, 2019, DEA intercepted calls involving ENRIQUE, EDUARDO, and a Mexico-based number about drugs arriving into the Bay Area. ................................................................................42

    C.    On the same day, ENRIQUE, KAREN, and CILDER discussed drug distributors' preferences about living arrangements and KAREN's role in coordinating the housing.................................................................46

    D.    The next day, June 5, 2019, ENRIQUE and UM-5228 coordinated new housing for street-level dealers on Martin Luther King Jr. Way in Oakland. ................................................................................53

    E.    On June 21, 2019, CILDER, EDUARDO, and VICTOR arranged a delivery of drugs. ..............................................................................55

VII.    Threats of violence and use of firearms ...........................................................61

    A.    In May 2019, JORGE bought at least one firearm that he intended to use in connection with his drug trafficking.............................................61

    B.    In July 2019, EDUARDO discussed guns with someone in Honduras and then asked that person to murder someone in that country...........66

VIII.    Seizure of suspected cocaine and heroin from EDUARDO and GONZALEZ ................................................................................74

    A.    On July 17, 2019, EDUARDO traveled to Los Angeles to buy drugs.........................................................................................74

    B.    On July 19, 2019, EDUARDO directed ENRIQUE to collect drug proceeds in the Seattle and drive them to the San Francisco Bay Area.........................................................................................79

    C.    On July 20, 2019, ENRIQUE and GONZALEZ drove the drug proceeds from the Seattle area to Livermore. .......................................84

    D.    In the early morning on July 21, 2019, EDUARDO, KAREN, and ENRIQUE moved from the Cherry Blossom House to a house in Tracy. ................................................................................86

    E.    On July 22, 2019, officers seized more than 3,800 gross grams of suspected drugs from EDUARDO and GONZALEZ on their way to the Seattle area. ................................................................................88

F.      EDUARDO, ENRIQUE, KAREN, VICTOR, CILDER, JORGE, and
        GONZALEZ reacted to the seizure. ...................................................89

CONCLUSION..............................................................................................94

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Eric J. Diamond, a Special Agent of the Drug Enforcement Administration (DEA), being sworn, hereby declare as follows:

## INTRODUCTION

1.  I submit this Affidavit in support of an application for a criminal complaint charging the following persons (the "Target Subjects") with violations of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) (conspiracy to distribute and to possess with intent to distribute controlled substances) arising from their participation in a conspiracy to sell methamphetamine, cocaine, and heroin:

    a.  EDUARDO Alfonso Viera-Chirinos a/k/a "Rojo";

    b.  VICTOR Viera-Chirinos a/k/a "Mojarra";

    c.  JORGE Alberto Viera-Chirinos;

    d.  Jorge ENRIQUE Torres-Viera a/k/a "Enrique";

    e.  KAREN Castro-Torres a/k/a "Delany Ellieth Cardona Velasquez" a/k/a "Belanie Elyzabeth Artiaga";

    f.  CILDER Velasquez a/k/a "Cilder Gamez";

    g.  Alexander GONZALEZ-Vasquez a/k/a "Ale";

    h.  GAMEZ Velasquez a/k/a "Bomba"; and

    i.  Luis ALMICAR Erazo-Centeno a/k/a "Pika."

2.  The statements in this Affidavit are based on my own investigation; information from other law enforcement agents, investigators, and individuals with knowledge of this matter; my review of documents related to this investigation; and my training and experience as a DEA Special Agent. This Affidavit does not purport to set forth all of the evidence gathered to date in this investigation, or to name all of the persons who participated in these crimes; I have included only those facts that I believe are necessary to establish probable cause for the requested criminal complaint and arrest warrants.

## RELEVANT STATUTES

3.      Under 21 U.S.C. § 841(a)(1), it is unlawful for a person to knowingly or intentionally manufacture, distribute, or possess with intent to distribute, controlled substances, including methamphetamine, its salts, isomers, and salts of its isomers; cocaine, its salts, optical and geometric isomers, and salts of isomers; and a mixture or substance containing a detectable amount of heroin.

4.      Under 21 U.S.C. § 846, it is unlawful for a person to attempt or conspire to manufacture, distribute, or possess with intent to distribute controlled substances.

## BACKGROUND OF INVESTIGATING AGENT

5.      I am employed by the United States Department of Justice, DEA, as a Special Agent ("SA") and have been so employed since September 2014.  I am presently assigned to the Oakland Resident Office ("ORO") in California.

6.      I have received formal training at the DEA Training Center in Quantico, Virginia. This twenty-week DEA Basic Agent Academy included instruction on, among other things, basic narcotic investigations, drug identification, drug detection, familiarization with United States narcotics laws, money laundering techniques and schemes, identification and seizure of drug-related assets, undercover work, and physical and electronic surveillance operations.  Prior to working for the DEA, I worked as a private attorney in California for approximately three and a half years and as an Attorney for the Orange County District Attorney's Office in Santa Ana, California, for approximately five months as part of the Trial Attorney Partnership ("TAP") Program.  Prior to working as an attorney, I served as a Certified Law Clerk for the Orange County District Attorney's Office.  In my capacity as a TAP Attorney and Certified Law Clerk, I received experience conducting misdemeanor jury trials and felony drug preliminary hearings.

7.      In addition to the above, I have spoken to and worked with more experienced federal and state narcotics agents and officers.  During my tenure with the DEA, I have participated in numerous investigations of illicit drug trafficking organizations, ranging from street level dealers to major traffickers, and while assigned to the ORO, I have participated in

numerous investigations of illicit drug trafficking organizations and organized criminal enterprises in the Northern and Eastern Districts of California. The investigations have involved the use of confidential sources (CSs), wire and physical surveillance, telephone toll analysis, investigative interviews, and the service of search and arrest warrants. I have conducted investigations into unlawful possession with intent to distribute and distribution of controlled substances, laundering of monetary instruments, and the associated conspiracies involving such conduct. These investigations have included the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, conducting monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses, in violation of 21 U.S.C. §§ 841(a)(1) and 846, which have resulted in state and federal prosecutions of individuals who have possessed, smuggled, received, and/or distributed controlled substances including: cocaine, heroin, methamphetamine, prescription pills (including counterfeit), and fentanyl, as well as the seizure of those illegal drugs and proceeds from the sale of those illegal drugs.

8.      In conducting these investigations, I have employed a variety of investigative techniques, including physical and electronic surveillance, analysis of telephone records and pen register data, interviewing witnesses, service of search and arrest warrants, and the drafting of criminal complaints, as well as handling informants and cooperating sources. In the course of these investigations, I have, at various times, participated in, planned, and/or supervised numerous instances of physical surveillance and electronic surveillance. Moreover, I have directed informants and have monitored meetings and consensual telephone conversations involving undercover agents and informants. I have participated in over one hundred and fifty hours of surveillance of narcotics traffickers. During surveillance, I have personally observed narcotics transactions, counter-surveillance techniques, and the methods narcotics traffickers used to conduct clandestine meetings.

9.      I have participated in more than six investigations in which court-authorized Title III interceptions were used in narcotics and money laundering investigations. During these

investigations, I have listened to and deciphered conversations between narcotics traffickers in which they discussed their criminal activities in coded language or intentionally vague language and which were later corroborated by surveillance or defendants' statements, and I have participated in seizures of narcotics and narcotics proceeds that resulted from the monitoring of these types of conversations. I also have interviewed several drug traffickers after their arrest, as well as confidential sources, and discussed with them the meaning of their coded language used during the course of the commission of drug and money laundering offenses. During these interviews, the arrested drug traffickers and confidential sources have explained to me how they use coded language to conceal the true nature of their conversations from law enforcement and anyone who may be listening or overhear the conversation. As a result, a person who did not know the code or their meaning would think the individuals were having an innocent conversation or be confused by the conversation since it would not make sense to that person.

10.     In addition, I have participated in approximately two follow-up investigations concerning the concealment of assets, money, bank records, etc., and the identification of co-conspirators through the use of drug ledgers, telephone records and bills, photographs, and financial records.

11.     I have been involved in the execution of more than forty state and federal narcotics related search warrants. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances. I am familiar with the appearance of fentanyl, marijuana, heroin, cocaine, methamphetamine, and other controlled substances. I am familiar with and aware of the terminology used by illegal drug traffickers concerning narcotics and narcotics dealing.

12.     I have interviewed more than fifteen drug dealers, users, and confidential informants and have discussed with them the lifestyle, appearances, and habits of drug dealers and users. I have become familiar with the manner in which illegal drug traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I

am also familiar with the manner in which narcotic traffickers use telephones, cellular telephone technology, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

13.     I have participated in approximately ten Organized Crime Drug Enforcement Task Force ("OCDETF") investigations.  OCDETF is a task force comprised of law enforcement agencies that jointly investigate drug trafficking organizations.  Through these investigations, I have gained expertise in the use of a variety of law enforcement techniques, including the application and use of electronic and wire interceptions, confidential informants, physical surveillance techniques including pole cameras and recorders and various other types of electronic surveillance techniques such as body wires and transmitters.  Additionally, I have gained knowledge and expertise in the use of telephone toll analysis and the analysis of traditional types of records, including financial, telephone, utility records, and nontraditional records including records maintained by narcotic traffickers listing amounts of drugs delivered and amounts of money owed (pay and owe sheets).  I have also gained knowledge and expertise in the collection and identification of drug evidence, and the analysis and interpretation of recorded conversations collected by the methods detailed above.

14.     I have also had discussions with other law enforcement officers and confidential informants about the packaging and preparation of narcotics, the methods of operation, and security measures that are often employed by narcotics traffickers.  I have examined documentation of various methods in which methamphetamine and other illicit drugs are smuggled, transported and distributed.

## STATEMENT OF PROBABLE CAUSE

**I.     Overview of Investigation Relevant to the Target Subjects**

15.     Since late October 2017, the DEA has been investigating organized criminal networks distributing illegal drugs in the Tenderloin neighborhood of San Francisco.  In about June 2018, the DEA began coordinating investigative efforts with the San Francisco Police

Department (SFPD) and Richmond Police Department (RPD), which were conducting parallel investigations.

16.     The investigation, described in more detail below, shows that one of the criminal networks supplying drugs to and in the Tenderloin is a drug trafficking organization (DTO) headed by EDUARDO Alfonso Viera-Chirinos (the "Viera DTO"), which since at least June 2018 has distributed drugs, including cocaine, heroin, and methamphetamine, in the neighborhood. The Target Subjects discussed in this affidavit are associated with the Viera DTO.

17.     As I explain in more detail below, I believe that the Viera DTO supplies street-level dealers who live in houses and apartments in Oakland and Hayward, California, and possibly elsewhere, that the DTO subleases to them. I believe that up to ten adult men live in each residence, sometimes with their partners and children. I will refer to these residences as the DTO's "redistributor houses."

18.     The street-level dealers pay rent to the Viera DTO to live in the redistributor houses. They also agree to sell drugs provided to them by the Viera DTO, which is a requirement for any dealer seeking to live in a redistributor house. EDUARDO's brothers JORGE and VICTOR Viera-Chirinos, nephew Jorge ENRIQUE Torres-Viera, significant other KAREN Castro-Torres, and associate CILDER Velasquez all help manage the redistributor houses.

19.     Based on the tone and context of the intercepted calls between the residents of the redistributor houses and the leadership of the Viera DTO, and discussions among the senior members of the DTO, I believe that the residents of the redistributor houses can be described as independent contractors who negotiate the terms of their engagement, including housing conditions, with the DTO.

20.     Based on physical and electronic surveillance, which I describe below, I believe that, several times a week since at least March 2019, CILDER has traveled to each of the redistributor houses and supplied the street-level dealers living there with distribution quantities

of drugs, including methamphetamine, heroin, and cocaine. CILDER typically delivers only enough drugs for the street-level dealers to resell over the next day or two, which I believe is a tactic designed to minimize legal exposure if the dealers are arrested.

21.    Based on intercepted calls, I believe that the Viera DTO obtains drugs from suppliers in Mexico or U.S. suppliers who are linked to Mexico-based suppliers (collectively, the "Mexican suppliers"). DTO members, including at least EDUARDO and KAREN, travel to the Los Angeles area to pick up drugs from runners working for the Mexican suppliers. They store these drugs in a "trap," or hidden compartment, built into the cars they are driving.

22.    Based on intercepted calls, I believe that the Viera DTO pays the Mexican suppliers by making wire transfers under false names. After a typical wire transfer, I believe that members of the DTO will send a photograph of the wire-transfer receipt to the suppliers via WhatsApp.

23.    Based on intercepted calls, I believe that the Viera DTO uses couriers to smuggle large quantities of cash out of the country on commercial airlines.

24.    Based on intercepted calls, I believe that certain members of the Viera DTO, including at least EDUARDO, JORGE, and ENRIQUE, carry firearms in furtherance of their drug trafficking. Based on intercepted calls, I believe that on at least one occasion, EDUARDO asked someone to murder an individual in Honduras.

## II.    Initiation of Investigation

### A.    The DEA's investigation began in fall 2017, when confidential sources and an undercover officer made controlled purchases of heroin from Individual 2.

25.    In late October 2017, a DEA confidential source (CS-1[1]) told DEA Special

---

[1] CS-1 has a misdemeanor criminal conviction for breach of peace. CS-1 is working with law enforcement in exchange for potential leniency at sentencing in a pending drug case. To the best of my knowledge and belief, CS-1 is reliable, and information from CS-1 has led to at least three successful prosecutions. For each of these controlled purchases, agents searched the person of CS-1 as well as his/her vehicle prior to the transaction to ensure that the CS did not possess any other drugs, weapons, money, or contraband. For each transaction, agents provided CS-1 with agency funds in cash. Agents also equipped CS-1 with a monitoring device, which created a recording and allowed agents to listen to the transaction and ensure the safety of CS-1. After each purchase was complete, CS-1 relinquished the purchased narcotics, after which agents

Agents that an individual whom I will call "Individual 1" could sell heroin to CS-1.[2] CS-1 also noted that Individual 1 had told a second confidential source (CS-2[3]) that Individual 1's supplier for black-tar heroin was "Raphael," whom agents later identified, and whom I will call "Individual 2." According to CS-1, Individual 1 quoted CS-2 a price of $300 to $350 for a quarter-ounce of heroin. CS-1 said he/she believed that Individual 2 sold drugs near Turk and Larkin Streets in San Francisco.

26. Based in part on this information, the DEA began investigating Individual 2 and his/her sources of supply. Between November 2017 and June 2018, CS-1, CS-2 and a law enforcement undercover agent (UC), acting at the direction of DEA agents, purchased heroin from Individual 2 several times.

**B. In June 2018, SFPD and RPD seized more than 5 pounds of drugs and $72,000 in cash from a residence associated with EDUARDO and KAREN.**

27. At the same time that DEA was investigating Individual 2, RPD Detective Brian Hoffman and SFPD Officer Brenton Reeder were conducting a separate investigation into potential drug trafficking by EDUARDO, KAREN, and JORGE, among others.

28. In connection with that investigation, from March to June 2018, SFPD and RPD

---

searched the CS for contraband.

[2] The confidential sources, such as CS-1, are not identified in this affidavit because their personal safety would be at risk if their identities were prematurely revealed to the Target Subjects and other persons under investigation or associated with them. These confidential sources are still actively assisting in the investigation. As discussed in this affidavit, one of the Target Subjects discussed planning a murder during an intercepted telephone call, and several Target Subjects are known to carry firearms.

In addition, certain individuals discussed in this affidavit are only identified by the word "individual" followed by a number. These are persons who are either (1) witnesses whose personal safety would be at risk if their identities were prematurely revealed to the Target Subjects and other persons under investigation or associated with them, or (2) persons involved in the criminal activity (such as Individual 1) who may be the subjects of further investigations and enforcement actions. Premature disclosure of these individuals' true names would compromise the effectiveness and security of those law enforcement actions.

[3] CS-2 is a Confidential Source handled by the U.S. Secret Service (USSS). CS-2 has the following criminal convictions: misdemeanor solicitation for prostitution and misdemeanor possession of drugs not to be introduced into interstate commerce. CS-2 is working with law enforcement in exchange for potential leniency at sentencing in a pending drug case. The USSS considers CS-2 to be knowledgeable, capable of working, and truthful in the information provided to investigators.

officers conducted surveillance of the individuals listed in the preceding paragraph. That surveillance showed that EDUARDO and KAREN frequently visited a residence on S. 24th Street (the "S. 24th Street Apartment").

29.    On June 4, 2018, Detective Hoffman and Officer Reeder obtained state search warrants to search the S. 24th Street Apartment, among other locations. Officers executed the search warrants the next day at about 6:00 am.

30.    At the S. 24th Street Apartment, officers found and detained two individuals I will call Individuals 3 and 4. The officers also found an air compressor that had been altered so that the top of the tank could be triggered to open. When they opened the air compressor, the officers found approximately 1173.7 gross grams of methamphetamine, 718.6 gross grams of heroin, 467 gross grams of cocaine base, 168.9 gross grams of cocaine powder, and $73,118 in cash. On top of the drugs and cash was a length of white paper towel on which were hand-written names and figures, including "Rojo" (which I believe based on intercepted calls is EDUARDO's nickname) and "Karen" (which I believe was a reference to KAREN).

31.    In the kitchen, the officers found cocaine base, heroin, and methamphetamine, all packaged for sale.

32.    In the central closet between the kitchen, living room, and bedrooms, the officers found, among other things, three notebooks containing pay/owe sheets. One included the following entries, which were originally in Spanish: "Jorge - White = 7 + 9 + 5   Black = 9   Glass = [blank]   Perico = 1". I know that drug dealers commonly maintain "pay/owe" sheets to keep track of how much they have been paid or are owed for drugs they have sold. I believe that these entries meant that JORGE had purchased cocaine ("white"), heroin ("black"), and methamphetamine ("glass"). I know based on my training and experience that "white" is a common code term for cocaine because it is white in color; that "black" is a common code term for heroin, which is typically dark brown or black in color; and that "glass" is a common code term for methamphetamine because in the form in which it is often sold in this area it resembles shards of glass.

33.     On June 6, 2018, Detective Hoffman contacted the individual who had rented out the S. 24th Street Apartment ("Individual 5"). Individual 5 produced a rental application showing that the apartment had been rented to "Delany Cardona." Individual 5 provided a copy of the identification card "Delany" had used; it had KAREN's picture on it and the name "Delany Ellieth Cardona Velasquez." I know that this is one of KAREN's aliases, because she provided it when officers conducted a traffic stop on her car in March 2018.

34.     Individual 5 reported that, in March 2018, with the rent past due, s/he went to the S. 24th Street Apartment between 10 and 11 pm. Seeing lights on inside, Individual 5 knocked on the door. A Hispanic male answered the door. Individual 5 asked for "Delancia" and then realized s/he had mispronounced the name. The Hispanic male asked, "Delany?" Shortly thereafter, the Hispanic male handed Individual 5 $2,240 in cash, all in $20 bills.

35.     On June 19, 2018, Officer Reeder met in person with Individual 5. Officer Reeder presented to Individual 5 separate sequential photographic lineups of six photographs each. Individual 5 identified KAREN as the person he knew as "Delaney" and EDUARDO as the Hispanic male he had seen at the S. 24th Street Apartment in March 2018.

36.     Electronic surveillance showed that EDUARDO had been at the S. 24th Street Apartment four hours prior to when the search warrant was executed.

### C.     Phones seized during the search warrants had been in contact with Individual 2.

37.     While executing the search warrants described above, officers seized multiple cellphones. A later forensic analysis showed that several of the phones seized had been in contact with Individual 2 at times relevant to the controlled purchases described above. As a result, SFPD, RPD, and DEA began coordinating their investigations of Individual 2 and EDUARDO, KAREN, JORGE, and their associates.

## III.     Identification of CILDER as a source of supply to Individual 2

### A.     Individual 2 explained to the UC which code words to use for which drugs.

38.     In October 2018, a court authorized DEA to intercept wire and electronic

communications over Individual 2's phone. Certain relevant communications that were intercepted by DEA pursuant to this order are described below.[4]  During the interception period, agents made additional controlled purchases of drugs from Individual 2.

39.     In connection with one controlled purchase, Individual 2 told the UC about code words that Individual 2 uses to discuss over the phone. Specifically, on November 15, 2018, the UC purchased approximately four ounces of heroin and two ounces of cocaine from Individual 2 and Individual 2's sibling. During the transaction, the UC was in a car with Individual 2 and asked what word Individual 2 used to discuss heroin over the phone, explaining that he/she did not like to use the word "heroin" on the phone. Individual 2 said s/he used the word "night." The UC then asked what word to use to order cocaine; Individual 2 said, "the day." The UC asked if that referred to "powder or hard," which the UC informs me is common street slang to distinguish between cocaine powder and cocaine base (crack). Individual 2 said it referred to powder cocaine. The UC then asked what word to use if the UC was ordering rock/crack cocaine; Individual 2 said there was no set term, but s/he referred to it as "dias" (Spanish for "days") and "dowse."

40.     Based on my training and experience, I know that "day" and "night" are code words that other drug traffickers commonly use to refer to cocaine and heroin, respectively. I believe that these code words are based on the drugs' appearance, because heroin can be black or brown in color, and cocaine powder is white and powdery.

41.     Shortly thereafter, Individual 2 told a third party to "bring them to [him/her]." I believe Individual 2 was telling his sibling ("Individual 5") to bring the UC the drugs he/she had

---

[4] The transcriptions and translations of conversations and quotations of language from intercepted calls set forth in this Affidavit are based on agents' current understanding of the conversations and may be amended in the future after further review and/or based on additional information. In some cases, portions of the conversations are inaudible, slurred, faded out, or mumbled. Unless otherwise noted, the statements from intercepted calls set forth in this Affidavit are recounted in substance and in relevant part. Unless otherwise indicated, Almost all of the intercepted conversations described in this Affidavit (other than intercepted calls with the UC) were in Spanish, and the excerpted language in this Affidavit is the preliminary English translation. I do not speak Spanish, and I have relied on persons who are fluent in Spanish to produce the preliminary transcriptions and translations of these calls.

ordered, because shortly thereafter Individual 5 got into the UC's car and handed him/her a clear plastic bag containing what was later determined to be approximately four ounces of heroin.

42.   The UC then asked Individual 2 if he had any "powder," and Individual 2 said it depended on how much the UC wanted to get. The UC asked for two ounces, at which point Individuals 2 and 5 began speaking in Spanish and used the word "perico," which is Spanish for "parakeet." Based on my training and experience, knowledge of this investigation (including listening to other intercepted calls), and discussions with other experienced law enforcement investigators, I believe that when Individuals 2 and 5 used the word "perico," they were discussing powder cocaine. I have frequently heard the word "perico" used in connection with discussions of drugs on calls intercepted during this investigation. The UC also informs me that s/he has heard "perico" used as a code word for powder cocaine.

43.   Later that day, Individual 5 gave the UC a clear plastic bag containing what was later determined to be about two ounces of cocaine.

**B.   Agents identified CILDER as a source of supply to Individual 2.**

44.   During the interception period for Individual 2's phone, DEA intercepted communications between Individual 2 and his/her suppliers, including an individual using a phone with a number ending in 5859 (the "5859 phone" or "5859 number").[5] Based on the surveillance described below, I believe CILDER was using the 5859 phone.

45.   For example, on November 1, 2018, agents attempted to purchase five ounces of heroin from Individual 2. Prior to the UC calling Individual 2 on November 1, 2018, DEA intercepted over Individual 2's phone a call between Individual 2 and an individual who I believe is the leader of another DTO active in the Tenderloin ("Individual 6"). On that call, Individual 2 asked Individual 6 if s/he had "day ones," and Individual 6 responded that s/he did not.

46.   About one minute later, Individual 2 called CILDER, who was using the 5859 number. A portion of that conversation follows:

---

[5] In this affidavit, I identify telephone numbers only by their last four digits.

| Individual 2: | Do you have work? |
| CILDER: | Yes, we do right now. |
| Individual 2: | Well, bring me some. |

47.     Based on my training and experience, knowledge of this investigation, and discussions with other experienced law enforcement investigators, I believe that Individual 2 called both Individual 6 and CILDER to ask if they could supply drugs. Based on the November 15, 2018, conversation between Individual 2 and the UC, I believe that Individual 2 asked Individual 6 for cocaine ("day ones"). I believe that, when Individual 6 said that s/he did not have "day ones" available, Individual 2 contacted CILDER, another source of supply. I know, based on my experience conducting narcotics trafficking investigations, from prior wiretap interceptions, and from conversations with the UC that "work" is a common word used by narcotics traffickers to mean drugs or drug dealing generally; to anyone listening, it will simply sound as if the person is looking for legitimate work, and not illegal narcotics (and selling drugs is their "work").

48.     The conversation between CILDER and Individual 2 continued as follows:

| CILDER: | Yeah, [U/I][6] so then I'll le-and how much are you going to want? |
| Individual 2: | I'm going to want... |
| CILDER: | How much are you going to want? |
| Individual 2: | I'm going to want one night one, and... |
| CILDER: | one [U/I] night one? |
| Individual 2: | Uh-huh.  Look, [U/I] one night one, bring me four day ones, and ... And a half for the nose, too. |
| CILDER: | Yeah.  It would be four, a half, and one? |
| Individual 2: | Yeah. |

---

[6] I use the notation "[U/I]" to indicate that certain words were unintelligible to the individuals monitoring the interceptions.

CILDER:                          Yeah, so then [U/I] I'll drop it by right now, in a
                                 few.

49.     I believe, based on the UC's conversation with Individual 2 on November 15,
2018, that Individual 2 was ordering one ounce of heroin ("one night one"), four ounces of
cocaine base ("four day ones"), and half an ounce of powder cocaine ("a half for the nose") from
CILDER.  As noted, Individual 2 told the UC that there was no set way to distinguish between
cocaine powder and cocaine base; I believe that, here, Individual 2 used the term "for the nose"
to refer to cocaine powder (which is primarily ingested by inhalation through the nose), and that
his separate reference to "day ones" meant cocaine base.  Because drug dealers and their sources
of supply develop a degree of trust and understanding, I believe that Individual 2 and CILDER
understand "day" to refer to different forms of cocaine depending on the context of the
conversation.

50.     At about 2:47 pm, DEA intercepted a call from the 5859 number to Individual 2's
phone.  The user of the 5859 phone (who I believe was CILDER based on the surveillance
below) said that he was arriving and confirmed that Individual 2 wanted "four, half, and, and one
night one."

51.     Shortly thereafter, DEA Special Agent ("SA") Andrew Decker saw Individual 2
walk onto Birch Street in Oakland and get into the right rear passenger's seat of a silver Honda
Accord.

52.     Moments later, SA Decker saw CILDER counting money while sitting in the
driver's seat of the Honda.  SA Decker then saw Individual 2 get out of the Honda.

53.     As the Honda drove away, it passed SFPD Detective Dave Goff.  Detective Goff
recognized the driver as CILDER based on prior contacts with him.

## IV.    Identification of ENRIQUE and JORGE as members of the same DTO as CILDER

### A.    CILDER was working with ENRIQUE, who appeared to be in a position of authority over CILDER.

54.     In March 2019, a court authorized DEA to intercept calls over a phone with a

number ending in 0911, which I believe CILDER was using at the time.[7]  Calls intercepted over

that phone showed that CILDER was working with ENRIQUE, among others.  For example,

what follows is a partial transcript of a call between CILDER on the 0911 phone and ENRIQUE

(who was using a phone with a number ending in 5982[8]) on March 10, 2019:

| | |
|---|---|
| ENRIQUE: | Hello? |
| CILDER: | What's up, dude?  Did you get those? |
| ENRIQUE: | Yeah, we got it, but we are going to return it.  It's not good. |
| CILDER: | Yeah? |
| ENRIQUE: | Huh? |
| CILDER: | It's because a guy is asking me for a whole one.  How much?  He asked how much you would give him a whole |

---

[7] I believe that CILDER was using the 0911 phone at this time for several reasons.  First, the Spanish-speaking monitors and SFPD Officer Brenton Reeder, who is familiar with CILDER's voice from prior in-person contacts, compared calls over the 0911 phone with calls from the 5859 phone and informed me that they believed the same person used both phones. Second, on February 14, 2019, based on location information showing that the 0911 phone was near 50th Avenue and Judd Place, Officer Reeder and RPD Officer Brian Hoffman set up surveillance nearby.  They saw a black Honda Accord parked on 50th Avenue at Judd Place. Shortly thereafter, Officer Reeder saw CILDER walk to the Accord and get in.  CILDER then drove away, at which point the location information for the 0911 phone showed that it had left the area.  Third, on March 8, 2019, DEA intercepted communications over the 0911 phone on which the user of the phone said that he was in San Francisco but was going to take BART to leave and, later, that he had just arrived in West Oakland.  At approximately the same time, I saw CILDER come out of the West Oakland BART station while looking at his phone.  Finally, later the same day, while I was following CILDER, I saw CILDER suddenly make a U-turn in his car. At about the same time, DEA intercepted a call over the 0911 phone on which the user of the 0911 phone told the caller that he had just "[seen] something weird" and told the caller where to meet him.  I believe, based on the calls and events, that CILDER had detected the presence of law enforcement and made a U-turn to try to prevent me from following him.

[8] I believe that ENRIQUE was the user of this phone because the monitors inform me that the voice of the user of the 5982 number appears to be the same as that of the user of the 0343, 7039, and 7042 numbers, which I believe ENRIQUE also used based on the context of intercepted calls (and for other reasons described below); and because on several intercepted calls intercepted calls other individuals, including EDUARDO, CILDER, and JORGE, made references to "Enrique" that, in context, suggested the user of all of these numbers was ENRIQUE; and because on July 22, 2019, the user of the successor 7042 phone identified himself as "Jorge Torres Viera" and then "Enrique Viera" (both versions of ENRIQUE's full name, Jorge ENRIQUE Torres Viera.  Additionally, on July 18, 2019, EDUARDO texted the 7042 number to an unknown individual and said that it was his nephew's number, which I believe was a reference to his nephew ENRIQUE.

|           | one of black, a whole one of day kind, and a whole one of glass. |
| --- | --- |
| ENRIQUE: | Of black kind, well—a whole one of glass two hundred. |
| CILDER: | I already told him that. |
| ENRIQUE: | Wait, a whole one of— |
| CILDER: | Of day kind is what he wants. |
| ENRIQUE: | And of night kind, you said? |
| CILDER: | Yes, as well. |
| ENRIQUE: | At eight forty. |
| CILDER: | Eight forty, the day kind? |
| ENRIQUE: | No, the night kind. |
| CILDER: | The night kind. |
| ENRIQUE: | Eight twenty the night kind. |
| CILDER: | Okay. |
| ENRIQUE: | Eight twenty and the day kind give it to him for nine hundred if you want. |
| CILDER: | The day kind? |
| ENRIQUE: | Yes. |
| CILDER: | If he doesn't want it—you tell him if he complains a lot, eight ninety, that's the least. |

55.    I believe based on my training and experience and knowledge of this investigation that CILDER and ENRIQUE were using coded language to discuss drugs and prices. Specifically, I believe that CILDER and ENRIQUE were discussing the prices for ounce quantities of heroin, cocaine, and methamphetamine.  I know for the reasons given above that "night" is code for heroin, "day" is code for cocaine, and "glass" is code for methamphetamine. "Black" is another common code word for heroin, because it is typically dark in color.[9]  In

---

[9] On a call between CILDER and KAREN from July 18, 2019, KAREN asked if

addition, as noted, I know that when narcotics traffickers mention a "whole one" or a "half," they are typically referring to a one "whole" quantity of drugs (an "eight ball," ounce, pound, etc.), or a half of each of those quantities, depending on context.

56.     Later the same day, ENRIQUE called CILDER from the 5982 phone and asked if CILDER had "sold" the one CILDER had been asking about, "the whole one." CILDER said no. CILDER said the "guy" wanted "the white kind" that day. ENRIQUE responded that he could give CILDER the "night" kind at 8. CILDER said he would let ENRIQUE know when the guy called back.

### B.    CILDER also worked with JORGE.

57.     Calls intercepted over CILDER's phone also showed that JORGE, who was using a phone with a number ending in 4817,[10] was working with CILDER to sell drugs. For example, on March 27, 2019, CILDER's 0911 phone received a call from the 4817 phone. The following exchange took place on that call:

| | |
|---|---|
| JORGE: | You working now? |
| CILDER: | Yeah. |
| JORGE: | That's good. I was going to tell you to give an 8 to that girl [U/I]. |
| CILDER: | What was that? |
| JORGE: | [U/I] so she can work. |
| CILDER: | To who? |

---

CILDER had given "Pika" (ALMICAR) "the black one." CILDER said it was "the night one" and that "it is the same thing." I believe this is additional evidence that "black" and "night" both refer to heroin.

[10] I believe that JORGE was using the 4817 phone as of this time for several reasons. First, based on my review of police reports, I know that JORGE's full name is Jorge Alberto Viera Chirinos. In approximately April 2019, SA Decker reviewed a law enforcement database and found a financial transaction under the name "Jorge Alberto Viera Chirinos," which occurred on December 24, 2018. The phone number provided in connection with this transaction was the 4817 number. Second, on March 7, 2019, during the interception of communications over CILDER's 0911 phone, the user of the 4817 phone called CILDER, identified himself as "Jorge," and said that he would stop by. Third, on a call intercepted over the 4817 phone on May 24, 2019, EDUARDO called the user of the 4817 phone "Jorge" and also made statements that I believe show that the user of the 4817 phone was EDUARDO's brother. Fourth, physical and electronic surveillance from May 23, 2019, link JORGE to the 4817 phone.

| JORGE: | A fuckin' [U/I] who lives by that fuckin' [U/I]. |
| CILDER: | Okay, how much you say? |
| JORGE: | One 8 [U/I] which one is cheaper, white or black. |
| CILDER: | The black. |
| JORGE: | Give her an 8.  She's crazy.  She's gonna work. |

58.     Based on my training and experience and knowledge of this investigation, I believe that CILDER and JORGE were discussing providing an amount of either cocaine or heroin to a female.  I know that "8" is a common code term for an eighth of an ounce of drugs, a common distribution quantity.  I also know that "white" and "black" are common code words for cocaine and heroin, respectively, due to the drugs' colors.  In addition, as noted, "work" is a common code term for drugs or selling drugs generally.

## V.    Identification of the Viera DTO's use of "redistributor houses"

### A.    Calls intercepted over CILDER's phone suggested that he was delivering drugs to multiple individuals living together at several residences.

59.     The calls intercepted over CILDER's 0911 phone suggested that, almost every day, CILDER was making rounds to various residences and supplying drugs to multiple street-level dealers who were living there together.

60.     For example, on March 12, 2019, at 10:07 am, CILDER's 0911 phone received a call from an unknown male using a phone number ending in 6085 ("UM-6085").[11]  UM-6085 asked if CILDER was "already working over there."  UM-6085 then spoke with someone else in the room and asked how much the other individual was going to want.  The other individual could be heard asking for "3 whole ones."  UM-6085 then told CILDER that it would be "3 whole ones" and "2 and a half."  CILDER said he would be "right there."

61.     Based on my training and experience and knowledge of this investigation, I

---

[11] I refer to persons whose true names are not yet known but who were participants in significant intercepted communications by the letters "UM" or "UF" (unidentified male or female, respectively) followed by the last four digits of the telephone number the individual used.

believe that CILDER and UM-6085 were discussing the quantities of drugs that CILDER was going to deliver to UM-6085's location. I believe that when UM-6085 asked if CILDER was already "working," he was asking whether CILDER was out delivering drugs; as noted, "work" is a common code term for drugs or the act of dealing drugs. I also know that the terms "whole one" and "half" are commonly used to refer to "whole" or "half" quantities of drugs, with the particular quantity depending on context. I know that drug dealers and their suppliers typically have an established relationship such that they can understand the amounts and types of drugs being referred to without specifically naming them.

62. About a half an hour later, CILDER, using the 0911 phone, called an unknown male whose phone number ended in 9119 ("UM-9119"). Their conversation follows:

| | |
|---|---|
| CILDER: | You're not gonna want anything? |
| UM-9119: | Six and a half but for us here in this room. |
| CILDER: | How much? |
| UM-9119: | Six and a half. |
| CILDER: | Six. |
| UM-9119: | Six and a half. |
| CILDER: | You saying six and a half? |
| UM-9119: | Yes. |
| CILDER: | Okay, be right there. |

63. I believe that when UM-9119 mentioned "us here in this room," he meant that he was making an order on behalf of himself and other drug dealers living in the same residence or in a specific room of the residence.

64. On a call a few minutes after that, at approximately 10:44 am, CILDER spoke with an unidentified male using a phone number ending in 6605 ("UM-6605"):

| | |
|---|---|
| UM-6605: | Bring me one and a half for Guacho and half for me. |
| CILDER: | So two you're saying. |
| UM-6605: | Yes, two. |

| CILDER: | I can bring you two because I don't have halves. |
| UM-6605: | Oh, okay. |
| CILDER: | I'm going to bring two whole ones for you two share. |

65.     I believe that when UM-6605 asked for "one and a half for Guacho and half for me," he was placing an order for himself and for another drug dealer named Guacho who lived in the same residence.

66.     Later the same day, at 3:32 pm, CILDER received a call from an unknown male who was using a phone number ending in 2336 ("UM-2336"):

| UM-2336: | You have some? |
| CILDER: | Yes. |
| UM-2336: | Of everything. |
| CILDER: | Of everything. |
| UM-2336: | Okay…call you back. |
| CILDER: | At night. |
| UM-2336: | Right now I'll call you back because I'll get the count right now.  They are sleeping [U/I]. |
| CILDER: | [U/I] |
| UM-2336: | I'm going to call you back now. |
| CILDER: | It's got to be now because I'm close. |
| UM-2336: | Okay, I will check with these guys. |

67.     When UM-2336 said he would "check with these guys," I believe he meant that he would check with the other drug dealers living with him to see which drugs they wanted CILDER to deliver to them.

68.     At 3:50 pm, UM-2336 called CILDER back, and the following exchange occurred:

| UM-2336: | Come now. |
| CILDER: | What do you want? |

| | |
|---|---|
| UM-2336: | I'm going to want [U/I] one and a half, two, four, two crystal, four of crystal, and three of [U/I -- talking to someone in background], you're going to want *perico*, three halves of *perico*. |
| CILDER: | A half for the nose. |
| UM-2336: | [U/I] So it's four, five, and a half of white. [Talking to someone in background.]  What else. |
| Unknown: | [U/I] *perico*. |
| UM-2336: | And half of *perico*, and of crystal, so two of crystal, three of crystal, and five and a half. |
| CILDER: | Uh-huh. |
| UM-2336: | [U/I] |
| CILDER: | And three nose. |
| UM-2336: | And three nose.  [To someone in the background:  "Okay, three of the nose."] |
| CILDER: | Okay, I'll be right there, then. |
| UM-2336: | How long until you get here? |
| CILDER: | In like 10-15 minutes. |
| UM-2336: | Okay, then call me when you're outside. |

69.    I believe, based on my training and experience and knowledge of this investigation, including the code terms discussed above ("white" kind for cocaine, "perico" for powder cocaine, and "crystal" for methamphetamine) that CILDER and UM-2336 were discussing the amounts of various drugs that CILDER was going to deliver to UM-2336 and others living with him.

**B.     Other calls showed that the Viera DTO subleasing "redistributor houses" to the street-level dealers it employed.**

70.    Further investigation revealed that CILDER was not distributing drugs to

independent groups of drug dealers who happened to be living together; rather, he was supplying drugs to lower-level drug dealers who lived in residences the Viera DTO subleased to them (the DTO's "redistributor houses"). The calls showed that the street-level dealers paid rent to CILDER or ENRIQUE and that they, KAREN, or JORGE would then pay rent for the whole redistributor house. The calls also showed that the street-level dealers often asked for new apartments or made requests about the size or price of the apartment, which ENRIQUE, CILDER, KAREN, and JORGE attempted to fulfill.

71. For example, on March 4, 2019, ENRIQUE (using the 5982 phone) called CILDER on the 0911 phone and asked if "Rudy" had paid CILDER the "rent." CILDER said no, and ENRIQUE said he would call Rudy the next day.

72. The next day, ENRIQUE and CILDER discussed how Rudy still had not paid the rent. A few days after that, CILDER told ENRIQUE that he had taken "some" to Rudy and that Rudy had given him the rent money, but that CILDER was not sure if ENRIQUE and unknown others had paid the rent yet. ENRIQUE said he and unknown others had not yet paid the rent.

73. Based on my training and experience and knowledge of this investigation, including additional calls and surveillance described below, I believe that when CILDER said he had taken "some" to Rudy and that Rudy had given him the rent money, CILDER meant that he had delivered drugs to the redistributor house where Rudy lived and, while there, collected rent money from Rudy.

74. On a March 10, 2019, call between CILDER and ENRIQUE, ENRIQUE mentioned seeing "an apartment" at 1:30. CILDER asked where it was, and ENRIQUE responded that he would send CILDER the address. Based on my knowledge of this investigation, including additional calls and surveillance described below, I believe that ENRIQUE and CILDER were discussing a potential new apartment into which they intended to move street-level dealers working for the DTO.

75. At about 1:00 pm, ENRIQUE, using the 5982 phone, texted an address to CILDER on the 0911 phone: "[street address redacted] birch street Oakland".

76.     A few seconds later, ENRIQUE called CILDER from the 5982 phone and said that he had just sent the address via text message.  CILDER asked "which phone" ENRIQUE had sent it to, and ENRIQUE said that he had sent it to "this" phone (the 0911 phone).  CILDER asked "what time," because "those crazies" were still lying down.  ENRIQUE told CILDER to "get them up" because it was at 1:30.  CILDER said OK and that he would meet up "over there."

77.     Based on my knowledge of this investigation, I believe that when CILDER referred to "those crazies," he meant the street-level dealers who live in the DTO's redistributor houses.  Based on calls and surveillance described below, I also believe that ENRIQUE and CILDER were discussing showing the street-level dealers a new apartment into which they were considering moving the dealers.

78.     Calls with JORGE from later that month shed additional light on the DTO's management of the redistributor houses.  For example, on March 15, 2019, CILDER, using the 0911 phone, called JORGE on the 4817 phone.  Below are excerpts of that 18-minute call:

| | |
|---|---|
| JORGE: | I was there and went around and around and around looking because I went to see three, but I didn't get to talk because I wanna talk with them all.  Well, who's in charge more than the rest, because I was there looking at nice places and got applications, and there's one that just needs the paperwork, then it's ready. |
| CILDER: | You don't need to be looking for anything nice, because these guys are saying they want 3.  One with 2 or 3 rooms. |
| JORGE: | Yeah, but you are talking about [audio glitch] Mayer and Pika. |
| CILDER: | Yes, that's fine, but if you can find another [audio glitch] that these guys want.  You know what I mean?  Because they are saying they want to leave there. |
| JORGE: | Yeah, ahh -- but [audio glitch] they want for the first or |

want for now?

          CILDER:          I don't know, that's the thing.

79.     Based on my training and experience and knowledge of this investigation, including other excerpts of this call described below, I believe that JORGE and CILDER were discussing renting redistributor houses for members of their DTO who are street-level dealers. I believe that, when JORGE said that he was "looking at nice places and got applications," he meant that he had looked at apartments for rent. When he asked CILDER, "Well, who's in charge more than the rest," and that he "want[ed to] talk with them all," he meant that he wanted to talk to the street-level dealers to understand what they were looking for. When CILDER said that JORGE did not need to look for anything nice and that the "guys" were saying they wanted "one with 2 or 3 rooms," I believe he meant that street-level dealers "Mayer" and ALMICAR (whose nickname is "Pika"[12]) were not picky about the apartment the DTO provided so long as it had two or three rooms. I believe that, when JORGE said, "Yeah, but you are talking about [audio glitch] Mayer and Pika," he meant that he had been talking about other street-level dealers who needed a redistributor house; later in the call, as discussed below, JORGE complained that "everybody" was asking for a new apartment.

80.     Later on the call, JORGE and CILDER said:

          CILDER          It's just those guys are the ones that are asking me for it.

          JORGE          Those guys?

          CILDER          The new guys, they said that they do get some but [U/I]...

          [Voices overlap]

          JORGE          Look, there is, there is an apartment, but it is over there on thirteenth (13th) and that one is ready, all they need to do is bring the money, but I do not know if the guys want -- people have told me it is hot there, but I do not think that it

---

[12] I believe that ALMICAR's nickname is Pika because he uses that name on his Facebook profile and others have referred to him by this name in intercepted calls.

| | |
|---|---|
| | is hot there. |
| CILDER | On thirteenth (13th)? |
| JORGE | Yes, in the blue building, in the building that is a greyish color over there on thirteenth (13th). |
| CILDER | Shit, it is hot over there. |
| JORGE | Yeah? |
| CILDER | Not just anyone will be willing to take it. That is the problem. |
| JORGE | Yeah, because there is one right there and there is another one over there on Diamond. [Background: noise] But, the one on Diamond, the one on Diamond is just one room. |
| CILDER | But well, over there on Diamond and that one there are hot. |
| 81. | [Voices overlap] |
| JORGE | Well, yeah. I... |
| | [Voices overlap] |
| CILDER | [U/I]. |
| JORGE | No, what I am saying is that those are the only ones that are ready to move in right away, if they want them. |

82.     I believe that when CILDER said the "new guys" were "asking for it," he meant that street-level drug dealers who had recently started working with the Viera DTO were asking for a redistributor house to live in. I believe that when JORGE responded that there was "an apartment" on "13th" that was ready, but that he had heard it was "hot," he meant that a potential redistributor house was ready on 13th Street, likely in Oakland, but that he had heard that there was significant law enforcement presence in that area; I know that "hot" is a common code term to refer to law enforcement's presence. When CILDER said, "Not just anyone will be willing to take it," I believe he meant that the street-level drug dealers likely would not want to accept accommodations in an area that was "hot"; I believe that this is further evidence that the street-

level dealers negotiate the terms of their accommodations with the Viera DTO.

83.    Later on the call, JORGE and CILDER said the following:

JORGE:         It's because the problem is spending every time someone wants to move and look how much is being lost when someone moves in and --

CILDER:        [U/I]

JORGE:         -- and with this business the thing is it's not good to be spending a lot [audio glitch] and you're not asking, but the thing is [U/I], that's why I couldn't pay you last week.

CILDER:        Yes.

JORGE:         I don't have enough to be getting apartments over here and over there.  If they have them because what they've got to do is take care of them.

CILDER:        Yeah, I'll talk to them.

JORGE:         Because I'm just basically starting, and Eduardo only left me with just a little work and a little bit of people that he had, and it's up to me to get that up.

[. . . .]

JORGE:         Everybody was calling yesterday [audio glitch] and everyone wants a new apartment.

CILDER:        No, I have to talk to them, because they don't need to be saying any of that shit.

84.    Later in the conversation, CILDER said that "Chapo" was an example of someone who complained a lot but would not "buy enough."

85.    I believe that when JORGE said "the problem is spending every time someone wants to move" and that "with this business the thing is it's not good to be spending a lot," he meant that it was expensive and bad for the DTO's drug-distribution business to be moving

street-level dealers into new redistributor houses every time they wanted to move. I also believe that when JORGE said that he was "just basically starting" and that "Eduardo" had only left him with "just a little work and a little bit of people that he had," he meant that EDUARDO—who I believe based on intercepted calls fled with KAREN to Seattle at some point after the June 2018 search warrants—had left JORGE in charge of the DTO's operations in the Bay Area and had given him only a relatively small amount of drugs ("work") and a group of street-level dealers who were working for the DTO. I also believe that when CILDER complained about "Chapo" not "buy[ing] enough," he was referring to a street-level dealer who lives in a redistributor house but does not buy a sufficient quantity of drugs from the DTO for resale. I further believe that this conversation shows that selling drugs supplied by the DTO is a condition of being permitted to live in a redistributor house.

86.     On March 18, 2019, at 11:52 am, JORGE called CILDER and said he was "here with the guy from the apartments." CILDER responded that "those crazy guys" wanted to see "it." JORGE told CILDER to "bring them right now." CILDER said he was too busy to do so but that he would "call them" and then call JORGE back. Approximately 8 seconds after this call ended, CILDER's other phone, with a phone number ending in 8377,[13] made an outgoing call to a male whose phone number ended in 2918 ("UM-2918"). Approximately two minutes later, CILDER called JORGE back using the 0911 phone and said that "they" would "go over right now."

87.     Later on March 18, 2019, at 12:26 pm, CILDER told JORGE that the "guys" were "on their way." JORGE told CILDER to confirm with them because "Michael" (who I believe was the landlord or rental agent) was still waiting for them. CILDER said OK. Approximately seven seconds after this call ended, CILDER's 8377 phone made another call to UM-2918.

---

[13] Communications over this phone were not being intercepted as of March 2019. I believe that CILDER was using the 8377 phone at this time because agents later intercepted communications over the 8377 phone, and the Spanish-language monitors informed me that, based on a voice analysis, they believed the same person used both the 0911 and 8377 phones. In addition, the sequence of the phone calls described in this and the next paragraph leads me to believe that CILDER was using both numbers.

About 46 seconds after that, at 12:27 pm, CILDER called JORGE on the 0911 phone and said the guys would "be there in five minutes."

88.  The next day, March 19, 2019, DEA intercepted additional calls between CILDER on the 0911 phone and JORGE on the 4187 phone that I interpret as being about problems that had arisen at one of the redistributor houses. At about 5:30 pm, CILDER asked if JORGE had gotten "the house" for "Mayer" and "Pika" (ALMICAR). JORGE said he would have an answer by Friday and that CILDER should tell the guys not to worry. CILDER said that a "lady" had told them (Mayer and ALMICAR) that she was going to call the cops. JORGE asked why, and CILDER said he did not know but that they (Mayer and ALMICAR) had gotten out. CILDER then said that the lady had told them that she knew what kind of "work" they did. JORGE then asked if there was somewhere the guys could go in the meantime. JORGE added that he did not know "all of the houses," but that CILDER did. Later in the conversation, CILDER said he would "see if they can stay somewhere else in the meanwhile," but that "there are ten guys."

89.  Based on my training and experience and my knowledge of this investigation (including additional intercepted calls about moving people from one residence to another), I believe that on these calls JORGE and CILDER were discussing how some of the street-level dealers had been kicked out of a redistributor house rented by the DTO when the landlady learned they were drug dealers. I also believe that when JORGE said that he did not know "all of the houses," he meant that the Viera DTO had many redistributor houses and that he was not sure where all of them were. I also believe that when CILDER said he would try to see if "they" could stay somewhere else but that it was "ten guys," he meant that ten drug dealers had been living in that redistributor house.

90.  Later that night, at about 10:29 pm, CILDER called JORGE, and JORGE said he would send "the address" to CILDER. JORGE told CILDER to "bring some stuff with the guys and head that way." Shortly thereafter, JORGE texted CILDER: "[Street address redacted] santa clara st Hayward".

91.    Based on my training and experience and knowledge of this investigation, including the surveillance described below, I believe that when JORGE sent the Santa Clara Street address to CILDER and told him to "bring some stuff with the guys and head that way," he meant that CILDER should bring the ten street-level dealers who had been kicked out of one of the redistributor houses, along with their belongings, so they could move into a new redistributor house at the Santa Clara Street address.

**C.    Starting around March 20, 2019, the Viera DTO began using the Santa Clara Street House as one of its redistributor houses.**

92.    After intercepting the calls and text described above, agents began conducting physical surveillance of the Santa Clara Street House.  Agents also monitored physical location data for CILDER's phone, which showed that he visited the Santa Clara Street House several times a week from late March through at least early June 2019, often after placing calls on which I believe he was be taking orders of drugs for delivery.

93.    For example, at about 11:09 am on June 4, 2019, CILDER, using a phone number ending in 0224,[14] called GAMEZ at a phone number ending in 3373.[15]  CILDER asked if GAMEZ was going to want something.  GAMEZ said he wanted "3 of rock and 2 of glass." CILDER said he would drop by.  Based on my training and experience in this and other investigations, I believe that GAMEZ was asking for three units of crack cocaine ("rock") and two units of methamphetamine ("glass").  I know that "rock' is a common slang term for cocaine

---

[14] I believe that CILDER was using this phone because a toll analysis showed that several top callers to CILDER's 0911 phone stopped calling CILDER's 0911 phone on or around April 13, 2019, and then began contacting the 0224 phone shortly thereafter.  A common-caller analysis also suggested that CILDER had transitioned to this phone.  Finally, the Spanish-speaking monitors and Officer Reeder (who speaks Spanish and has interacted with CILDER in person) informed me that they believed CILDER was using this phone.

[15] I believe that GAMEZ was using the 3373 phone because on July 24, 2019, at about 7:36 pm, Officer Michael Cunnie saw GAMEZ sitting on the ground against the U.S. Federal Building, on the Turk Street side.  Officer Cunnie called the 3373 number.  At the same time as the phone began ringing, Officer Cunnie saw GAMEZ lift a cellphone from his waist area and look at it.  The phone Officer Cunnie was calling from then stopped ringing, as though someone had answered.  GAMEZ brought the phone to his ear and appeared to say something into it. With only a slight delay, Officer Cunnie heard a male's voice say, "Hello?"  After a moment, Officer Cunnie ended the call.  He then saw GAMEZ lower his phone from his ear.

base, or crack cocaine, and that this nickname comes from its appearance. As noted, "glass" is a common slang term for methamphetamine based on its clear, crystalline appearance.

94.    At about 1:25 pm, DEA intercepted a call from CILDER's 0224 phone to a male using a phone number ending in 2821 ("UM-2821") on which CILDER said he was going to "go over to those guys right now." CILDER said he was looking for parking but there was none.

95.    At about 1:40 pm, SFPD officers saw CILDER park the gold Honda on El Dorado Avenue, just west of Santa Clara Street. CILDER, who was wearing a camouflage-patterned bag, got out of the car and walked to the Santa Clara Street House. CILDER entered the front gate of the residence and then walked through the driveway to the rear of the house and out of view. Based on my training, experience, and knowledge of this investigation, including the call intercepted at 1:25 pm and later surveillance described below, I believe that CILDER had drugs in the backpack and that he was delivering them to UM-2821 and others at the Santa Clara Street House.

96.    At about 3:13 pm, a dark gray Infiniti G37 approached the area and parked on El Dorado Avenue, east of Santa Clara Street. A Hispanic male got out of the car. The male then walked to the Santa Clara Street House and entered through the front door.

97.    About 10 minutes later, at about 3:23 pm, CILDER came out of the Santa Clara Street House. He was not wearing the camouflage bag; I believe he had left the drugs inside the house. CILDER walked to his car, opened the driver's side door, retrieved a cellphone, and then closed the door. CILDER then went back through the front gate of the Santa Clara Street House and then walked down the driveway to the rear of the house and out of view.

98.    At about 3:30 pm, SFPD officers saw an unknown Hispanic male walk out the front door. The male was wearing a red snap-back hat with a white logo and a blue backpack.[16]

99.    At about 3:39 pm, another Hispanic walked out the front door.

---

[16] The next day, SFPD Officers Michael Cunnie and Anthony Scafani saw the same Hispanic male, wearing the same hat and backpack, loitering at the corner of 8th and Jesse Streets in San Francisco. Based on their training and experience, Officers Cunnie and Scafani inform me that this area is one where drugs are commonly sold on the street.

100.     At about 3:48, the Hispanic male who had arrived at around 3:13 pm left the residence.

101.     At about 3:55 pm, two other unknown Hispanic males walked out the front door.

102.     At about 4:00 pm, DEA intercepted a call over CILDER's phone with a number ending in 0224 to a phone number ending in 1034 ("UM-1034"). CILDER asked if "they" wanted some. UM-1034 could then be heard asking others in the background what they wanted. UM-1034 then told CILDER, "5 and a half of the day kind, 2 of glass." UM-1034 then asked if the black kind was at 100, and CILDER said yes. UM-1034 then asked for one. CILDER confirmed that it was one of the "night kind," and UM-1034 said yes. For the reasons given above, I believe UM-1034 was asking for cocaine ("day kind"), methamphetamine ("glass"), and heroin ("night kind").

103.     At about 4:04 pm, CILDER walked up the driveway of the Santa Clara Street House, got into his gold Honda, and drove away.

104.     Based on my training, experience, and knowledge of this investigation, including the surveillance and intercepted calls described above, I believe that the Santa Clara Street House is a redistributor house that the Viera DTO used from at least March to June 2019. I believe that ALMICAR (a/k/a "Pika") is one of the street-level distributors who lived in the Santa Clara Street House, because officers have seen ALMICAR at this residence, and because on June 7, 2019, after SFPD officers saw CILDER enter the house, DEA intercepted a call over CILDER's 8377 phone on which he said that he was "at Pika's." Later the same day, the officers saw CILDER and ALMICAR leave the Santa Clara Street House together.

### D.     On most days, CILDER travels to the redistributor houses and resupplies the street-level dealers living there with distribution quantities of drugs.

105.     I believe that, on most days when agents were intercepting communications over CILDER's phone in March, May, June, and July 2019, CILDER made rounds to the Viera DTO's redistributor houses to deliver drugs to the street-level dealers living there. During these periods CILDER coordinated with other DTO members, including ENRIQUE, about the

deliveries.

106.     For example, on June 10, 2019, from approximately 8:41 am until about 9:49 am, ENRIQUE, using a phone number ending in 7039,[17] exchanged calls with Individual 7, who I believe supplies pound and kilogram quantities of drugs to multiple DTOs active in the Tenderloin. Individual 7 and ENRIQUE talked about meeting. At about 9:59 am, Individual 7 told ENRIQUE to "park somewhere and walk to me," and ENRIQUE agreed. As I describe further below, I believe that this may have been a meeting to obtain drugs, which ENRIQUE then provided to CILDER.

107.     At approximately 11:08 am, CILDER, using the 0224 phone, called a telephone number ending in 6624 and spoke with a woman who, on other calls, self-identified as Catherine. Catherine asked if CILDER had something, using a word that was unintelligible to the monitors. CILDER said yes, and Catherine said she would "send [CILDER] a message." CILDER acknowledged and said he would "be there shortly."

108.     At 11:10 am, Catherine texted CILDER: "I want an 8 and 1/2 of white and a half of powder. I was not able to tell you because I had the windows opened." Based on my training and experience, I believe that Catherine was asking for cocaine base ("white") and cocaine powder ("powder"). Although I have heard drug dealers use "white" to refer to powder cocaine, I believe that here Catherine distinguished between the two types of cocaine by calling powder cocaine "powder."

109.     At approximately 11:09 a.m., in between the communications with Catherine, CILDER, using the 0224 phone, called a male whose phone number ended in 0059 ("UM-0059"). CILDER asked if UM-0059 was "going to want something." UM-0059 said he wanted "one of night and one of white," which I believe meant heroin ("night") and cocaine ("white").

---

[17] I believe that ENRIQUE used this phone because on July 22, 2019, the user of this phone identified himself as "Jorge Torres Viera" and "Enrique Viera," both versions of ENRIQUE's full name (Jorge ENRIQUE Torres Viera). Additionally, the Spanish-speaking monitors compared the voice of the user of the 7039 phone to the voice of the 5987 phone and the 0343 phone and informed me that they believed all three phones were used by the same person.

UM-0059 said he had left the money somewhere, later saying it was "there in the box." CILDER said he was about to arrive.

110.    At approximately 11:34 pm, physical location data for the 0224 phone placed CILDER on Interstate 580 heading west near Isabel Avenue.

111.    At approximately 11:45 am, CILDER used the 0224 phone to call "Agustine," a male who used a phone number ending in 6085. CILDER asked if Agustine was going to need something. Agustine said he would ask others and then call CILDER back. CILDER said that was fine. At approximately 11:48 a.m., Agustine called back and asked for "1 and ½ of white" and said that another person wanted "1 of chiva" and that this other person would pay CILDER the following day. I believe CILDER and Agustine were discussing cocaine ("white") and heroin, because "chiva" is a common code term for heroin.

112.    At 12:23 pm, CILDER asked Agustin to open the door because he was there.

113.    At approximately 11:46 am, CILDER used the 0224 phone to call GAMEZ on the 3373 phone. CILDER asked if GAMEZ wanted anything that day. GAMEZ said "not until later." CILDER asked if this would be when GAMEZ got off work, and GAMEZ said yes.

114.    At approximately 11:49 pm, physical location data for the 0224 phone placed CILDER on westbound 580 at Schaefer Ranch Road.

115.    At approximately 12:04 pm, physical location data for the 0224 phone placed CILDER on westbound 580 at Keller Avenue.

116.    At approximately 12:20 pm, physical location data for the 0224 phone placed CILDER within 182 meters of 650 34th Street, Oakland.

117.    At approximately 12:34 pm, physical location data for the 0224 phone placed CILDER on 33rd Street, Oakland.

118.    At approximately 12:30 pm, CILDER, using the 8377 phone, called ENRIQUE on the 7039 phone. CILDER asked what was going on with "Tonon's stuff." ENRIQUE told CILDER to tell "Tonon" that there was no work. CILDER said that "Tonon still needed," and ENRIQUE said that a third party was not answering. Based on the timing of this conversation

and the calls with Individual 7, I believe that ENRIQUE was trying to get additional drugs for CILDER to provide to a redistributor named "Tonon."

119.    At approximately 12:36 pm, ENRIQUE's 7039 phone called Individual 7. I believe that, on that call, ENRIQUE asked Individual 7 to try to get him a "michelada." Individual 7 said that s/he would try, but "there was nothing." Individual 7 said s/he would "give someone a call and see when she could get that half of the mango." ENRIQUE said that people were calling and that they "needed work." Individual 7 also asked about "the whole" that s/he had given to another person.

120.    I know from my experience in this and other wire investigations that "michelada" can be code for a half quantity of drugs. Because it would be strange to obtain a half of a mango, and because the two were referencing "work," I also believe that ENRIQUE and Individual 7 were using out-of-context or coded nouns to refer to drugs. Here, I believe that ENRIQUE knew that CILDER had run out of a certain kind of drug and was trying to get additional material from Individual 7 to provide to CILDER.

121.    At approximately 12:48 pm, using the 0224 phone, CILDER called a male who was using a phone number ending in 3161 and who, on other calls, he referred to as "Sapo." CILDER asked if Sapo wanted anything, and then the call cut off.

122.    At 12:50 pm, Sapo called back and asked CILDER to bring "2 more of glass and 2 of day and 1 more of glass." Sapo said it was 2 of "glass" and 5 of "day," then. CILDER agreed. I believe they were discussion methamphetamine ("glass") and cocaine ("day").

123.    At approximately 12:49 pm, physical location data for the 0224 phone placed CILDER approximately 102 feet from the residence on Martin Luther King Jr. Way, Oakland, that I believe the Viera DTO uses as a redistributor house.

124.    At approximately 12:54 pm, Individual 7 called ENRIQUE on the 7039 phone. Individual 7 said s/he had called a third party and that "everything that they brought had gone out." Individual 7 asked ENRIQUE to hold on and "not hang up" because s/he was "looking at some things." Individual 7 then put ENRIQUE on hold. When s/he came back, s/he said that

s/he "did not have any material" right now. Individual 7 and ENRIQUE then discussed getting a "half" from ENRIQUE's uncle and Individual 7 trying to move money around. Based on the context of the conversation, I believe that Individual 7 were discussing where they could obtain drugs.

125.    At approximately 1:05 pm, physical location data for CILDER's 0224 phone placed CILDER near 19th Street and Telegraph Avenue, Oakland.

126.    At approximately 1:16 pm, CILDER, using the 0224 phone, called a male who was using a phone number ending in 4371 and whom on other calls he had called "Cuba." CILDER asked if Cuba needed anything that day. CILDER asked what Cuba wanted, and Cuba said, "2 of day." CILDER said he would be there in a little while. I believe they were discussing cocaine ("day").

127.    At approximately 1:20 pm, physical location data for the 0224 phone placed CILDER on eastbound 580 near Laney College, Oakland.

128.    At 1:34 pm, physical location data for the 0224 phone placed CILDER at High Street and Foothill Boulevard.

129.    At approximately 1:48 pm, Cuba and CILDER spoke again via the 0224 phone, and CILDER stated that he had arrived.

130.    At approximately 1:49 pm, physical location data for the 0224 phone placed CILDER at Ygnacio Avenue and Belvedere Street, which is around the corner from a residence where I believe the DTO maintains a redistributor house on Foothill Boulevard in Oakland.

131.    At approximately 3:04 pm, physical location data for the 0224 phone placed CILDER at Santa Clara Street and Amador Way, which is next to the Santa Clara Street House.

132.    At approximately 3:17 pm, ALMICAR, using a phone number ending in 6644,[18]

---

[18] I believe that ALMICAR was using this phone because on May 15, 2019, ALMICAR was arrested for dealing drugs on 9th Street in the South of Market neighborhood and provided the 6644 number to the arresting officers. In addition, on July 24, 2019, KAREN called PG&E to start utilities at what I believe was a new redistributor house on Oak Street in Oakland. KAREN asked whether a third party could open the account, and the PG&E representative said yes. A man then came to the phone and said that his name was "Luis ALMICAR Erazo Centeno" and that his phone number was the 6644 number. The man also provided a birthdate

called CILDER on CILDER's 8377 phone. ALMICAR asked if CILDER was coming to the house, and CILDER said he was "already there." ALMICAR said the money was "there on the table" and then asked for "1 of crystal and 1 of white." ALMICAR then spoke to someone in the background, saying that CILDER was asking how much the other person was going to want. A voice in the background said that he was "not going to want anything." ALMICAR then asked another person in the background about the location of the money, and that person said that it was "in the closet on the top part." ALMICAR repeated the location of the money to CILDER and said that it was "2 of white" for the other individual heard in the background. CILDER asked if "Santiago wanted anything." ALMICAR asked Santiago, who also appeared to be in the background, when he was going to pay CILDER. I believe they were discussing methamphetamine ("crystal") and cocaine ("white").

133.     At approximately 3:19 pm, physical location data for the 0224 phone placed CILDER at Santa Clara Street and Amador Way, which is next to the Santa Clara Street House that I believe the DTO uses as a redistributor house.

134.     GPS data for the 0224 phone showed that CILDER was still near the Santa Clara Street House as of 3:34 pm and 5:34 pm that day.

135.     At approximately 5:37 pm, a male known as "Yordi" called CILDER at the 0224 phone using a phone number ending in 4052[19] to ask for "1 of white kind, 1 of black kind," and "1/2 of perico." CILDER said that when the "other guys called," he would take it to all of them. CILDER said he thought the other guys would call later on. Yordi then asked how much an "ounce of crystal" was, and CILDER said "180." Yordi said that someone wanted an ounce, but it was "too expensive." Yordi asked if CILDER could see about getting it for "160 for an ounce," and CILDER agreed. I believe they were discussing cocaine ("white" and "perico"), heroin ("black") and methamphetamine ("crystal").

---

that, based on a records check, I believe is ALMICAR's birthdate.

[19] I believe that "Yordi" uses this phone because on a June 5, 2019, call between CILDER and ENRIQUE, ENRIQUE asked for "Yordi's" number, and CILDER provided the 4052 number.

136.    At approximately 6:49 pm, physical location data for the 0224 phone placed CILDER at Foothill Boulevard and 13th Avenue, Oakland.

137.    At approximately 7:00 pm, another male using a phone number ending in 2693 ("UM-2693") called the 0224 phone and asked where CILDER was.  CILDER said he was outside.  UM-2693 said he needed "5 whole ones of the day and 2 halves."  He then asked for "a whole 8 of nose kind and [U/I] of black kind."  He then said "5 and 2 halves," and that "it is 6, but two are halves."  CILDER said "6 and 2 halves" and then asked if UM-2693 needed anything else, saying he would be right there.  CILDER asked if UM-2693 had asked Yordi, and then UM-2693 spoke to someone in the background, saying "CILDER is asking if you will be needing anything."  CILDER then said to UM-2693 that he could not remember how much Yordi wanted.  UM-2693 asked someone in the background, "Are you going to want black kind? Cilder is asking."  UM-2693 then returned to the phone to say, "1/2 of crystal, 1 of black kind," and CILDER asked, "1 of white kind and ½ of nose kind?"  UM-2693 said yes.  CILDER then repeated the order: "1 ½ of nose kind, 6 and 2 halves of white, 2 of black, and ½ of glass."  CILDER then said that if Yordi wanted one more, "it would be 6 and 2 halves."  UM-2693 said, "Yes."  I believe that they were discussing cocaine ("white" and "nose kind"), heroin ("black kind"), and methamphetamine ("glass").

138.    At approximately 7:04 pm, physical location data for the 0224 phone placed CILDER at Martin Luther King Jr. Way and 18th Street, near a residence on Martin Luther King Jr. Way where I believe the DTO maintains another redistributor house.

139.    Based on my training and experience, knowledge of this investigation, and discussions with other experienced law enforcement investigators, I believe that CILDER and the individuals in these calls were discussing cocaine (powder and crack), heroin, and methamphetamine.  On many of these calls, CILDER called one individual who spoke with others in the background, which corroborates my belief that the Viera DTO rents houses to multiple drug redistributors at a time who work together to obtain and to sell drugs.  These calls, combined with CILDER's movements (as evidenced by cellphone location data), and his

statements in the calls about his location, make me believe that CILDER was making drug deliveries to the Viera DTO's redistributor houses.

## VI.  EDUARDO's return to the San Francisco Bay Area

### A.  In or about June 2019, EDUARDO returned to the San Francisco Bay Area to continue operating the DTO.

140.    As discussed above, I believe that, at some point after the execution of state search warrants in the summer of 2018, EDUARDO and KAREN moved to Seattle and left others, including JORGE, in charge of the daily operations of the DTO in the Bay Area.

141.    On June 3, 2019, however, DEA intercepted a call suggesting that EDUARDO had returned to the San Francisco Bay Area and was once again in charge of the DTO's operations in this area. Specifically, at about 9:39 pm, DEA intercepted a call from UM-7056 to CILDER's 0224 phone. CILDER told UM-6056 that "that dude" had "put some guys right there." UM-6056 asked who, and CILDER responded, "Some guys from [U/I]." UM-6056 asked CILDER how many, and CILDER said "two." CILDER said that the guys do not drink and that they just smoke weed. UM-6056 told CILDER he wanted to go his own way and did not want those guys to smoke weed in front of the girl. CILDER said he had told the guys. Also on that call, UM-6056 asked who was in charge right now, "Rojo or Enrique." CILDER said "Rojo." UM-6056 asked if "Enrique" was getting a "taste of it," and CILDER responded that "Enrique" was "in charge of the houses" and Rojo was "in charge."

142.    Based on my knowledge of this investigation, I know that "Rojo" is one of EDUARDO's nicknames. When CILDER said "Rojo" was "in charge" and that "Enrique" was in charge of the "houses," I believe that he meant that that EDUARDO was in charge of the Viera DTO overall, but that ENRIQUE was responsible for managing the redistributor houses used to house street-level dealers (possibly in lieu of JORGE, who I believe had been doing so as of March 2019).

143.    I further believe that CILDER and UM-6056 were discussing the situation in the redistributor house that UM-6056 was living in. I believe that when CILDER said that "that

guy" had "put some guys right there," he meant that ENRIQUE—the manager of some of the redistributor houses—had moved two new men into the redistributor house where UM-6056 lived. I also believe that when UM-6056 said he wanted to go his "own way" and did not want the other guys smoking marijuana in front of "the girl," he was telling CILDER he did not want to live in the house anymore if the two new residents were going to smoke marijuana around an unidentified female.

### B. On June 4, 2019, DEA intercepted calls involving ENRIQUE, EDUARDO, and a Mexico-based number about drugs arriving into the Bay Area.

144. On June 4, 2019, at 2:57 pm, ENRIQUE used the 7039 phone to speak with a male user of a phone with a number ending in 1948 and a country code of "+ 52" ("UM-1948"). Based on a subsequent call from ENRIQUE to EDUARDO, which I describe below, I believe that UM-1948, is a source of supply to the Viera DTO.[20] The country code and area code (667) make me believe that this is a phone number from Culiacan, Mexico. Below are excerpts of that call:

> ENRIQUE: Yeah. I will be going towards Oakland right now. The gi, the girl is by Oakland, right?
>
> UM-1948: I do not know exactly where she is, man. I think…because

---

[20] On May 29, 2019, this same phone number called Individual 8, a distributor of pound and kilogram quantities of at least cocaine. In the call, I believe that Individual 8 and UM-1948 discussed the availability of narcotics. Individual 8 said he did not have "work" and did not know what was going on. Individual 8 asked if there were any "down there." UM-1948 said there were some, but "they" were at "25." Individual 8 asked if that was down there at "la Tia," and UM-1948 said no, that that was all the way up there. UM-1948 said he had not done anything with it because "they" would pay "26" for them and it was not worth it. UM-1948 said the most expensive would be "26 and a half" and they would charge him "one peso" to take them up, so UM-1948 would be left with "500." UM-1948 said he would risk too much. Individual 8 asked if they would price it here at "25," and UM-1948 said yes. Individual 8 asked UM-1948 to get "1" for him. UM-1948 told Individual 8 that he (Individual 8) could not get only "1" and that it would have to be "3" and up. Individual 8 agreed. UM-1948 said the guys would do it if it was "3 and up" and would price it as "25." Individual 8 said alright. UM-1948 said it was not worth it for him because sometimes it would be "2" and he paid "2 pesos" and made "100 pesos." UM-1948 then said that "it was hard now with the government there and that the "old man was fixing the country." Based on the context of these calls, I believe that UM-1948 is someone who distributes drugs to Individual 8 and the Viera DTO and that UM-1948 is based in a foreign country, perhaps Mexico. Based on the pricing discussion, and a later seizure of cocaine from Individual 8, I believe that they were discussing kilogram quantities of cocaine.

|  | I think she is from San Francisco |
| ENRIQUE: | Oh.  Call her and ask her if she can come closer to Oakland. |

. . . .

| UM-1948: | Um, your uncle did tell you that I was going to give you twelve and a half (12½), no? |
| ENRIQUE: | 12? |
| UM-1948: | Uh-huh.  And a half. |
| ENRIQUE: | Oh no.  I am going to call him right now . . . I am I am going to call him right now because I, I have some money here [U/I] |
| UM-1948: | Oh, see if . . . see if they can be um, make sure they are not ones.  Do you know what I mean . . . . Because he gets those for 3 on the plane.  No, um, so it does not look like a big stack. . . . Well, that big.  If it can be in twenties and higher bills.  The largest bills you have. |
| ENRIQUE: | You see, I only have 2,000 in ones. |
| UM-1948: | Yea, that's the bad thing because… since they are going to bring them, man.  And you know that the [U/I] go with, like…with like almost 20 packets. . . . They will look very big.  I do not know if you could change them. |
| ENRIQUE: | Yeah.  That is the problem, I have to see where to change them. |
| UM-1948: | At the bars.  Yes, at the bars. |
| ENRIQUE: | The problem is that I do not have, I do not have anyone I could ask. [Background: noise] |
| UM-1948: | Well, I don't know, man.  Check because yeah, honestly, |

> there is no reason for me to tell you... the girl is not going to want to take them if they are ones (1). Because, since she is going to [U/I].

[Voices overlap]

ENRIQUE:    Um, I will, I will, I will get that then. If not [U/I] the one in ones (1).

UM-1948:    Yes. The thing is that [Audio glitch] she will come back on a plane, man. And in...well just think what a big stack that would be. . . . It is going to be tough. So then, I am going to call the girl right now and I will send her the, your number. She will call you to let you know where you guys will... [Audio drop]

145.    I believe that ENRIQUE and UM-1948 were discussing bulk-cash smuggling of drug proceeds out of the country by plane. When UM-1948 said that ENRIQUE should get twenties and larger bills, and ENRIQUE said he had "ones," I believe the two were discussing how the woman smuggling the money would prefer to take larger bills, since that would allow her to carry more money in a smaller space. When UM-1948 said, "with like almost 20 packets. . . . They will look very big," I believe he meant that packets of cash would be too large if they were comprised entirely of one-dollar bills.

146.    About an hour later, at approximately 3:59 pm, DEA intercepted a call between ENRIQUE, using the 7039 number, and EDUARDO, who was using a phone number ending in 8938.[21] During the conversation, ENRIQUE said "I am going to . . . to see Espiker. We

---

[21] I believe that EDUARDO was using the 8938 phone because on May 24, 2019, DEA intercepted a call over JORGE's phone on which he spoke for over an hour with the male user of the 8938 phone. Based on the content of this call, on which the user of the 8938 phone described JORGE as his "brother"; a voice comparison with the user of a phone number ending in 6442, which for reasons given below I believe EDUARDO previously used; and the context of calls intercepted over both EDUARDO's 8938 phone and EDUARDO's 6442 phone on June 21, 2019 (discussed below), I believe that EDUARDO was using the 8938 phone on this date.

planned for around this time." ENRIQUE asked if EDUARDO had said it was "2.5."
EDUARDO said, "Yes, 2.5." ENRIQUE said he was going to "take it right now" and that he
was going to get the "paper."

147. Later in the conversation, I believe that the two discussed the availability of
heroin (which they called "black"), the pricing for heroin, and VICTOR's access to and quality
of heroin.

| | |
|---|---|
| EDUARDO: | The black already ran out over here. . . . I have to pay the guy so he can send more . . . . Grab, grab . . . . Check the work Mojarra has. But, um, see that, hopefully he opens it in front of you [U/I] closely, so you grab about 10 pieces from him, until I get some for me. |
| ENRIQUE: | Uh-huh |
| EDUARDO: | Yeah. [U/I] about 10 . . . . But Mojarra is sneaky. [U/I] Mojarra gets that work cheaper. |
| ENRIQUE: | Yeah, I think they give... they give it to Mojarra cheaper. [U/I] expensive. |
| EDUARDO: | How much, how much are they giving it to him for? . . . I understand they were going for twenty-three (23). He's so sneaky. |
| ENRIQUE: | No. I, did not hear how much, how much they give it to him for. But I think they give it to him for cheap. |
| EDUARDO: | Really |
| ENRIQUE: | Yeah |
| EDUARDO: | Mojarra is very shady. But honestly, look [U/I], right now... Right now it is better if you look for... he said there was a little house there in Hayward... Uh, but, I do not know if you want, and it is better that we look for a, a |

place for us to move separately.

ENRIQUE: Yeah, an apartment.

[Voices overlap]

EDUARDO: I am saying, so [U/I]. I will, I will give you a hand differently. Do you understand? Meaning, I want to give you a hand really well, to be strong, then.

[. . . .]

148. I believe based on my training and experience, knowledge of this investigation, and discussions with other experienced law enforcement investigators that on this call ENRIQUE reported that he was going to go meet with Espiker and asked EDUARDO to verify that the amount of drugs to be sold to Espiker was "2.5" units. I also believe that when ENRIQUE said that he was going to get the "paper," he was referring to money; "paper" is a common code word used to refer to money. I also believe for reasons given above that when EDUARDO mentioned "black," he was referring to heroin. I also believe that when EDUARDO mentioned "Mojarra" he was referring to his brother VICTOR Viera, whose nickname is Mojarra. As noted above, "work" is a common code term to refer to drugs generally, so I believe that when EDUARDO said Mojarra got the "cheapest work," he meant that VICTOR bought low-quality drugs. I also believe based on my training and experience, knowledge of this investigation (including the call described above), and discussions with other experienced law enforcement investigators that when EDUARDO told ENRIQUE to "look for a house," he was instructing ENRIQUE—who is in charge of at some of the redistributor houses—to look for a new redistributor house in the city of Hayward. I further believe that EDUARDO was offering to help support ENRIQUE.

**C.  On the same day, ENRIQUE, KAREN, and CILDER discussed drug distributors' preferences about living arrangements and KAREN's role in coordinating the housing.**

149. Later the same day, June 4, 2019, at about 7:15 pm, ENRIQUE, using the 7039 phone, called CILDER and said that "Catherine" could "move to 13th" and "the other guys" would move to 13. ENRIQUE said "Rapero" would move to "Rudy's" and stated that "Rudy's"

was "only 3." CILDER said yes and mentioned that he had already talked to "him" (possibly Rudy). The two men then discussed getting a car or truck to use.

150.    Based on my training and experience and knowledge of this investigation, I believe CILDER and ENRIQUE were discussing moving street-level dealers to new redistributor houses after a third party had informed CILDER on a different call that he had seen a law enforcement officer ("some narco dude") performing surveillance.

151.    Minutes later, at approximately 7:18 pm, DEA intercepted a call between ENRIQUE and KAREN, who was using a phone number ending in 9035.[22] Their discussion follows:

| | |
|---|---|
| ENRIQUE: | [I/A] |
| KAREN: | Uh-huh. |
| ENRIQUE: | Yes. Or, or, or, figure out what you can do because…to, to move them from there. |
| KAREN: | Are you going to move them over there, to, where Sapo is? |
| ENRIQUE: | Yes, to, to, a…over there to where, to where Rudy, where Rudy used to live because over there at Rudy's there are only three now. |
| KAREN: | Are you talking about the bottom one? The one that is at the bottom? |
| ENRIQUE: | Yes, the one that is at the bottom. At, in the one that [U/I]. |
| KAREN: | Oh, that's fine. |
| ENRIQUE: | Yes. |
| KAREN: | [I/A] alright then, that is fine. Yeah because [U/I]… |

---

[22] I believe that EDUARDO's significant other KAREN used this phone because DEA intercepted several calls on which ENRIQUE and later EDUARDO said that "Karen" was calling and then answered a call from the 9035 number. In addition, I know that EDUARDO and KAREN have at least one child together, and on a call intercepted over EDUARDO's phone, EDUARDO directed the user of the 9035 number to take care of the kids. Finally, on a call at 7:28 pm on July 24, 2019, the user of this telephone identified herself as "Karen Castro Torres."

[Voices overlap]

ENRIQUE:     But…

KAREN:     …was calling.

ENRIQUE:     Yeah.  But, but I do not, do not know what to do to, to get a truck to, to move them.  Because they said that…

[Voices overlap]

KAREN:     [U/I] Lalo, over there by Walgreen's [PH].

ENRIQUE:     I'm going to call him, I'm going to call him to see if he has a truck.

KAREN:     Um-hum.

ENRIQUE:     Right now…let me call him right now to see what…if he has one.

[Voices overlap]

KAREN:     Alright then.  [U/I] the guys said that not right now, until night time but you would have to, you have to have that ready.

ENRIQUE:     [U/I] that I have not paid the rent there yet [U/I].

KAREN:     Yeah, yeah.  Damn it, we are going to lose the deposit.

ENRIQUE:     [Background: voices] Yeah.  [Background: Alright.]  Um, yeah we are going to lose the deposit from there.

KAREN:     It is three thousand right there.

ENRIQUE:     Yeah.

KAREN:     And you have not, you have not talked to Eduardo about that?

ENRIQUE:     No, I have not talked to him, well since…I just talked, I just talked to Cilder right now, I was just speaking to Cilder right now.

| | |
|---|---|
| KAREN: | Yeah? |
| ENRIQUE: | Yeah because I, I was giving him more, more work, so then Cilder told me that those dudes called him. |
| KAREN: | Oh, yeah.  Then… |
| | [Voices overlap] |
| ENRIQUE: | Yeah. |
| KAREN: | …you have to ask him how, of, [U/I] to leave it like that. Look… |
| | [Voices overlap] |
| ENRIQUE: | Uh-huh. |
| KAREN: | I think, I think…I am going to look for someone who wants an apartment, I am going to see but, but she does not work like that, she works legally. |
| ENRIQUE: | Uh-huh. |
| KAREN: | So in order not to lose the deposit I am going to ask Eduardo if he we can give it to her. |
| ENRIQUE: | Uh-huh. |
| KAREN; | And then mm, and then…because is a, is a girl, the one that is helping me with Fernando. |
| ENRIQUE: | Uh-huh. |
| KAREN: | She told me that, that if I can help her the other month with an apartment, at least with one of those that they leave. |
| ENRIQUE: | Uh-huh. |
| KAREN: | And so then I am going to call…I am going to see what Eduardo says.  That way we can give it to her and then once… |
| | [Voices overlap] |

| ENRIQUE: | Uh-huh. |
|---|---|
| KAREN: | … [I/I] the month, the, the, the year we can ask for the deposit back.  [Background: voices] |
| ENRIQUE: | Yeah. |
| KAREN: | Um-hum. |
| ENRIQUE: | Um, are, are you going to call uncle or should I call him?  [U/I].  [Voices overlap] |
| KAREN: | [U/I] Eduardo is here in front of me, in the other car.  I am just going to wait for him to get down right here, at the same place, [U/I] the same place that I am at and I am going to ask him. |
| ENRIQUE: | Al--, alright then.  Ask, ask him and see what…you tell him that [U/I].  Tell him that you already spoke to me then.  And, and… |
| KAREN: | [I/A] alright, uh-huh. |
| ENRIQUE: | Yeah so that, so that way I do not have to call him. |
| KAREN: | Alright then. [Background: voices] I am going to call him because he gets mad very easily. |
| ENRIQUE: | Yeah.  Talk to him because you already know how he is.  [Voices overlap] |
| KAREN: | Yeah. |
|  | [. . . .] |

152.    I believe based on my training and experience, knowledge of this investigation, and discussions with other experienced law enforcement investigators that on this call ENRIQUE and KAREN were discussing moving people out of a redistributor house the DTO used to house street-level dealers—specifically, a redistributor house on Campbell Street in Oakland—because

of fears that law enforcement was surveilling the residence. I know that SFPD Officers were conducting surveillance outside the suspected redistributor house on Campbell Street in Oakland on June 4, 2019. Based on calls intercepted over CILDER's phone earlier that night, UM-2693 had seen SFPD officers who were conducting surveillance of CILDER near the redistributor house on Campbell Street. On those calls, UM-2693 specifically described the surveilling officer's clothing and vehicle. On one call, CILDER told UM-2693 that he should "move all of that" in the meantime. I believe based on my training and experience and knowledge of this investigation that CILDER was telling UM-2693 and others in the residence to move any drugs they had to a different location in light of the surveillance.

153.    I believe based on my training and experience, knowledge of this investigation, and discussions with other experienced law enforcement investigators that when KAREN and ENRIQUE referred to "Eduardo," they meant EDUARDO Viera, who I believe is KAREN's significant other and ENRIQUE's uncle. I believe that on the call described above, KAREN and ENRIQUE were discussing how to move people out of the redistributor house on Campbell Street without losing the $3,000 security deposit. During this discussion, KAREN mentioned the possibility of having another woman move in, even though the woman "does not work like that, she works legally." I believe, based on this exchange, that KAREN knew the residence had been rented as housing for persons selling drugs for the Viera DTO, and that she was willing to move in someone who is not involved in illegal activities if the DTO could avoid losing the $3,000 security deposit. Additionally, "Sapo" is the nickname of an individual who, based on intercepted calls, I believe is a street-level dealer supplied by CILDER; so when KAREN referred to moving people to "where Sapo is," I believe she was proposing moving people to a redistributor house where at least one street-level dealer was already living.

154.    Later that night, at about 8:57 pm, ENRIQUE, using the 7039 phone, again spoke with CILDER on the 8377 phone. ENRIQUE said to wait, and that he was going to talk to "Karen," because "those guys" wanted to stay. ENRIQUE said "they" had spoken to Karen and then clarified that "Bomba and Keshan" had spoken to "Karen" (which I believe meant that

GAMEZ[23] and "Keshan" had spoken to KAREN).  ENRIQUE said he was going to call Karen to see what they had said, and that he would move the people who wanted to move.  CILDER said yes and that Bomba would have to figure out the rent money.  ENRIQUE agreed.

155.    Minutes later, at approximately 9:02 pm, DEA intercepted another call between ENRIQUE on the 7039 phone and KAREN on the 9035 phone:

| | | |
|---|---|---|
| KAREN: | Hello! |
| ENRIQUE: | Hello! |
| KAREN: | Uh-hum |
| ENRIQUE: | This is what uncle said…I talked to uncle Eduardo and he said, he said to leave those dudes there, that is what he said. |
| KAREN: | Oh look, I spoke to Tavo right now. |
| ENRIQUE: | Uh-hum |
| KAREN: | Tavo said him and Herson [PH], were not planning on moving out. |
| ENRIQUE: | Uh-hum |
| KAREN: | They won't, because, because they saw those two at, at, at, what is it called, at a laundry mat that is burned already. |
| ENRIQUE: | Uh-hum |
| KAREN: | They said they would go there, but they will not move. |
| ENRIQUE: | They would not? |
| KAREN: | No. |
| ENRIQUE: | [Aside: [U/I]] |
| KAREN: | Yes, so then just the other ones. |
| ENRIQUE: | Just the other ones? |

---

[23] I believe that GAMEZ's nickname is "Bomba" because on a call from March 4, 2019, at 4:19 pm, CILDER addressed the user of the 3373 phone as "Bomba."  For the reasons given above, I believe that GAMEZ uses the 3373 phone.

| KAREN: | Yes. |
|---|---|
| ENRIQUE: | Just...alright then we should move them [U/I]. |
| KAREN: | Yes, that is what they said. |
| ENRIQUE: | Uh-hum |
| KAREN: | Yes, they [U/I]. |
| ENRIQUE: | I will call you. |
| KAREN: | Alright. |
| ENRIQUE: | I will call you. |

156.    I believe based on my training and experience, as well as the intercepted calls, that KAREN and ENRIQUE were once again discussing street-level dealers living in the redistributor house on Campbell Street. I believe that when ENRIQUE said he had talked to "Uncle Eduardo" and that he had said to "leave those dudes there," he meant that his uncle EDUARDO Viera had instructed him not to move certain street-level distributors to another residence. I also believe that KAREN and ENRIQUE were talking about how some of the people, including "Tavo" and "Herson," did not want to move and wanted to stay in the residence. Based on the foregoing, I believe that KAREN is involved in EDUARDO and ENRIQUE's drug trafficking activities.

**D.    The next day, June 5, 2019, ENRIQUE and UM-5228 coordinated new housing for street-level dealers on Martin Luther King Jr. Way in Oakland.**

157.    The following day, at around 12:05 pm, ENRIQUE, using the 7039 number, called VICTOR, who was using a phone number ending in 9229.[24]  VICTOR asked about "the rent," and ENRIQUE said that he was "going to get the money from CILDER" and that VICTOR could provide the other half later that night.  VICTOR agreed.  ENRIQUE then asked

---

[24] I believe that VICTOR used the 9229 number because, as described below, on June 21, 2019, EDUARDO told CILDER that "Mojarra" was bringing "work" to CILDER, and then CILDER and the user of the 9229 number repeatedly discussed meeting up to make an exchange. I know that "Mojarra" is VICTOR's nickname, so I believe that EDUARDO meant that VICTOR was bringing the drugs to CILDER and therefore that the 9229 number belongs to VICTOR.

if VICTOR would go to ENRIQUE's room to send ENRIQUE "a picture of some addresses that are in the notepad." VICTOR agreed. ENRIQUE then asked VICTOR to call "Julio" to let him know that ENRIQUE would be calling.

158.    I believe that when VICTOR asked about "the rent," he was asking about rent money paid by street-level dealers living in one of the Viera DTO's redistributor houses.

159.    At 12:14 pm, from the 7039 number, ENRIQUE texted: "[street address redacted] martinluther king jr Way Oakland ca 94612 apartamento #1" to a phone number ending in 5228.

160.    Seconds later, ENRIQUE, using the 7039 number, called the 5228 number and greeted "Julio." (UM-5228). ENRIQUE asked if UM-5228 "got the address." UM-5228 said yes, and that he was "going to make a call" and call ENRIQUE right back.

161.    At 2:26 pm, ENRIQUE and UM-5228 spoke again over the 7039 number and the 5228 number. UM-5228 said that he was waiting on a call from the electric company and that the wait time was 45 minutes. UM-5228 said he would call back once "they" (likely the electric company) called him.

162.    At 4:42 pm, UM-5228 texted ENRIQUE: "I am on the phone." Minutes later, they spoke, and UM-5228 confirmed that "everything was ready."

163.    At 6:41 and then at 6:47 pm, UM-5228 texted ENRIQUE "Call me, it's important" and "Answer please." They spoke at 7:12 pm, and UM-5228 said that "the lights [were] on now." UM-5228 said he got a call back from "them," and they had to ask him some things because he has "8 houses with electricity" under his name. UM-5228 said that he had forgotten some of the addresses. He said that he was asked a number of questions and then put on hold for a period of time, but the lights were on. They then discussed meeting at "Cesar's."

164.    Based on the context and timing of this call, I believe that the Viera DTO likely has at least 8 separate redistributor houses that have electrical utilities under UM-5228's name.

165.    I later obtained records from PG&E for the residence on Martin Luther King, Jr. Way where I believe the DTO maintains a distribution house. The records showed that the PG&G account for the residence was maintained under the name "Julio [Last name redacted],"

and the phone number associated with the account was the 5228 number. The utilities for this residence were activated on June 5, 2019. I am awaiting records from PG&E showing all residences under "Julio's" account.

    **E.**    **On June 21, 2019, CILDER, EDUARDO, and VICTOR arranged a delivery of drugs.**

    166.    On June 21, 2019, at approximately 1:59 pm, DEA intercepted a call between CILDER, who was using the 0224 phone, and EDUARDO, who was using a phone with a number ending in 6442.[25] CILDER and EDUARDO had the following exchange:

| | |
|---|---|
| CILDER: | Hey. |
| EDUARDO: | Cilder, there is, there is work now, what's up uh—Are you finished [U/I] are you coming over here? |
| CILDER: | Yeah, right now uh—I'm going to go here through [U/I]. |
| EDUARDO: | What, dog? |
| CILDER: | You can't bring it? |
| EDUARDO: | Yes. I'm, I'm uh, if I don't go, Victor will. |
| CILDER: | All right. If you want I'll head towards Santiago, I'm here. |

    [Voices overlap]

| | |
|---|---|
| EDUARDO: | How much, how much do you want? |
| CILDER: | Some [U/I] |
| EDUARDO: | Huh? Five (5)? |
| CILDER: | Yes, [U/I] |
| EDUARDO: | Yes, all right then. |

    167.    As noted, I know that "work" is a common code term for drugs generally. Thus, I

---

[25] I believe that EDUARDO was using this phone because in a call intercepted on June 15, 2019, GONZALEZ told KAREN he had been trying to call EDUARDO, but EDUARDO was not answering. KAREN asked which of EDUARDO's numbers GONZALEZ had been trying to call and whether it was "the one that ends in 6442." GONZALEZ said yes, and KAREN told him to try the other number. In addition, physical location data for this phone frequently placed it at an address on Cherry Blossom Way in Livermore where agents have seen EDUARDO.

believe that when EDUARDO told CILDER that there was work now, EDUARDO meant that he had drugs. I believe based on my training, experience, and knowledge of this investigation that EDUARDO was trying to find out if CILDER would come by EDUARDO's location to pick up the drugs.[26] I believe that when CILDER asked if EDUARDO could bring "it" to him and EDUARDO said, "If I don't go, Victor will," EDUARDO meant that either he or VICTOR would deliver the drugs.

168.    Later the same day, at approximately 3:13 pm, DEA intercepted a call between CILDER, using the 0224 phone, and EDUARDO's 8938 phone[27]:

| CILDER: | Man, I've been calling you for a while… |
|---|---|
| | [Voices overlap] |
| EDUARDO: | What is up, dude? [Sneezes] |
| CILDER: | But I could not… |
| EDUARDO: | Yes, oh, I am sitting on it and I did not hear it. |
| CILDER: | Yes? |
| | [Voices overlap] |
| CILDER: | You are done? |
| EDUARDO: | For sure, I am almost putting it in the bags. |
| CILDER: | Right on, get on it because they are rushing me already. |
| EDUARDO: | For sure, right on, right now, now, now. |
| | [Voices overlap] |
| CILDER: | Right on. |

[26] Physical location data for the 6442 phone placed the telephone at a residence on Cherry Blossom Way in Livermore, California, throughout the day. Agents had seen EDUARDO and ENRIQUE meet at this location a few weeks prior, on June 3, 2019.

[27] I believe that EDUARDO was using the -8938 phone on this call, because the Spanish-speaking linguists monitoring the phones, as well as Officer Reeder (who speaks Spanish), compared the voice of the user of the 6442 phone to the voice of the user of the 8938 phone and opined that the same person was using both phones. Additionally, the context of the calls intercepted on this date suggests that CILDER was trying to call EDUARDO on the 6442 phone and called EDUARDO's other phone, the 8938, when EDUARDO did not answer the 6442 phone.

EDUARDO:        I will be over there.

169.    Based on the context of the prior call between EDUARDO and CILDER, I
believe that when EDUARDO said he was "putting it in the bags," he meant that he was putting
drugs into bags.

170.    Shortly thereafter, at approximately 3:59 pm, DEA intercepted a call between
CILDER, using the 0224 phone, and EDUARDO, using the 6442 phone.  During this call,
another adult male also spoke with CILDER from EDUARDO's 6442 phone.  For the reasons
given below, I believe that this male was VICTOR.  The parties had the following exchange:

CILDER:         What is up? Uh-huh!

EDUARDO:        Dude, Mojarra is on the way, and is taking you five (5).

[Voices overlap]

CILDER:         I do not see him.

EDUARDO:        He is on the way, well…he will call you.  I do not know
                where you want to meet him.

[Voices overlap]

CILDER:         [U/I] he just left?

EDUARDO:        No, he is barely, barely leaving dude, I am not going to lie.

CILDER:         [U/I] right on, I will see what is up [U/I].

[Voices overlap]

EDUARDO:        [U/I]

                [Background: what is your number, Cilder?]

CILDER:         Have him give it to you, to you.

[Background: wait up]

CILDER:         [U/I]

[Background: pass him over]

VICTOR:         With who?

CILDER:         Rojo.

[Background: do not be [U/I] says Cilder]

CILDER:              Write down the number.  Oh!

VICTOR:              [U/I] Cilder.  I am not [U/I].

[Voices overlap]

EDUARDO:           [U/I]

CILDER:              Because no.

[Background: it is very fat]

[Background: what is up, fucker?]

CILDER:              Listen, fatty [laughter].

[Background: do I have a faggot face, or what is the deal?]

[Laughter]

CILDER:              Right on that [U/I].

VICTOR:              [U/I]

[Voices overlap]

CILDER:              Calling? [Pause] Did you get it?

171.    I believe based on my training and experience, knowledge of this investigation, and discussions with other experienced law enforcement investigators that when EDUARDO said "Mojarra is on the way, and is taking you five," he meant that that his brother VICTOR, whose nickname is "Mojarra," would be bringing drugs to CILDER shortly.  I further believe based on this call and calls described below that the second male with EDUARDO was VICTOR.  Toward the end of this call, CILDER asked, "Calling? [Pause] Did you get it?"  At around the same time, CILDER's phone received an incoming call from VICTOR's 9229 phone.  A Spanish-speaking linguist listened to this call and compared the voice of the second male who was intercepted speaking with CILDER over EDUARDO's 6442 phone with the voice of the user of the 9229 phone.  The Spanish-speaking linguist believes that the two voices belong to the same person (although the audio of the 3:59 pm call is of lower quality due to it being on speaker phone).

172.     About 20 minutes later, at 4:20 pm, DEA intercepted a call from VICTOR's 9229 phone to CILDER. VICTOR asked where CILDER wanted to meet up. VICTOR said he was meeting a third party on "3rd" and directed CILDER to meet him there. CILDER said okay. Over the next 40 minutes, DEA intercepted three more calls between CILDER and VICTOR over the 0224 and 9229 phones. On each of these calls, the two men discussed where to meet and how much longer it would take VICTOR to arrive at CILDER's location in Oakland (CILDER: "In about how long until you arrive?" VICTOR: "Like in about, I can be there in seven minutes." VICTOR: "I am almost there, I am getting off the freeway already.").

173.     On the last of this series of calls, VICTOR provided landmarks to help identify his location. As the two got closer, they said the following:

| VICTOR: | Oh, I, I see you [U/I] over there. |
| CILDER: | For sure, hurry up…you have a bag? |
| VICTOR: | Yes but, it is see through, tell me over there, we will see it there. |
| CILDER: | Oh, just here, because over there, there is a lot of cops, come…stay there I will go get you. |

174.     I believe based on my training, experience, and knowledge of this investigation, including the previously discussed calls and another call between CILDER and EDUARDO described below, that VICTOR and CILDER were coordinating where to meet so that VICTOR could deliver drugs from EDUARDO to CILDER.

175.     Later the same day, at about 5:30 pm, EDUARDO, using the 6442 phone, called CILDER on the 0224 phone and asked if "the dudes" had waited for CILDER. CILDER said yes. EDUARDO asked if "they" were happy with the "work." Later, CILDER said that he had to go back because the third parties wanted "night." EDUARDO asked how much "night" was left, and CILDER said not a lot.

176.     I believe that on this call EDUARDO was asking CILDER whether certain customers were happy with the quality of the drugs that EDUARDO had had VICTOR deliver to

CILDER. As noted, I know that "work" is slang for drugs in general and that "black" is a common code word for heroin.

177. A few days later, on June 25, 2019, at 5:41 pm, DEA intercepted a call between ENRIQUE and VICTOR, who were using the 7039 and 9229 phones, respectively. I believe that on these calls, VICTOR and ENRIQUE were coordinating the delivery of drugs from VICTOR to ENRIQUE.

| | |
|---|---|
| ENRIQUE: | What's up? |
| VICTOR: | Dude? |
| ENRIQUE: | Tell me? |
| VICTOR: | You think that the work will fit in that car of yours? |
| ENRIQUE: | How many are there? |
| VICTOR: | 3. |
| ENRIQUE: | They it. |
| VICTOR: | They fit? |
| ENRIQUE: | They fit. I'll arrange them well. |
| VICTOR: | I'll wait for you on ninety eighth (98th) then. |
| ENRIQUE: | What part? |
| VICTOR: | Over by Tono because it's near there or he said like around…a car wash [U/I]. |
| ENRIQUE: | And where will I leave the car? |
| VICTOR: | They are going to take me over there right now. |
| ENRIQUE: | Oh, hopefully my tire doesn't pop [U/I]. All right I'll be right there. [U/I]. |
| VICTOR: | All right then. |

178. I believe based on my training and experience, knowledge of this investigation, and discussions with other experienced law enforcement investigators that VICTOR was discussing delivering narcotics ("work") to ENRIQUE. I also believe that ENRIQUE may have

a "trap" or hidden compartment in his vehicle. During the call, VICTOR asked ENRIQUE if the "work" would "fit in that car of yours?" ENRIQUE asked VICTOR how many, and VICTOR responded, "3." ENRIQUE told VICTOR that he would arrange them to fit. I know that narcotics traffickers will often use "traps" or hidden compartments in their vehicles to hide their drugs. While I do not believe that VICTOR and ENRIQUE were discussing a huge quantity of drugs (three kilograms at most), I believe that they were discussing more than ENRIQUE typically transports at a given time. Hence, VICTOR wanted to confirm with ENRIQUE that the drugs would fit.

## VII.   Threats of violence and use of firearms

179.    Based on intercepted calls and surveillance, I believe that members of the Viera DTO, including at least EDUARDO, JORGE, and ENRIQUE[28] have carried firearms in connection with their drug trafficking. I also believe, for reasons given below, that EDUARDO has asked another individual to murder someone in Honduras.

### A.    In May 2019, JORGE bought at least one firearm that he intended to use in connection with his drug trafficking.

180.    On May 23, 2019, DEA intercepted calls over JORGE's 4817 phone that I believe show that JORGE and others planned to buy at least one firearm and that they intended to use the firearm(s) the following day in furtherance of their drug trafficking activities. On the first intercepted call for the day,[29] at approximately 7:22 pm, the user of a phone number ending in 8168 ("UM-8168") called JORGE. Their conversation follows:

| | |
|---|---|
| JORGE | Hello? |
| UM-8168 | He wants, one thousand three-hundred for both, a nine and a forty. |
| JORGE | One thousand three-hundred? |

---

[28] I discuss calls that I believe show that ENRIQUE has carried a gun in connection with drug trafficking in section F, below.

[29] A pen register shows that JORGE's phone made and received several other calls earlier in the day; however, this call was the first one provided to agents by AT&T during the period of interceptions over JORGE's phone.

| UM-8168 | Uh-huh! |
|---|---|
| JORGE | He doesn't sell just one? |
| UM-8168 | No, he wants to sell them right now, he wants to sell them because he has them [U/I] and each one [U/I]. |
| JORGE | Uh-huh! |
| UM-8168 | Each caliber is a little more than seven hundred. |
| JORGE | Yeah like—right now they sell them at that price. Both of them come out to about six-hundred and fifty each one. |
| UM-8168 | Oh! |
| JORGE | Yeah, he's given them for a thousand three-hundred. They are six-hundred and fifty each one. |
| UM-8168 | Yeah, they are about seven-hundred. |
| JORGE | Yeah, then let me see. Fuck, I can get one but let me call the cousin to see what's up, if he wants to pay the other one. Well for both, we— we both need them. |
| UM-8168 | Huh? |
| JORGE | We both, with the cousin need them so let me see. Let me ask him if he wants to pay the other one—. |

[Voices overlap]

| UM-8168 | When? But when will the thing be done? The problem is—. |

[Voices overlap]

| JORGE | No, no—. |

[Voices overlap]

| UM-8168 | That's what he is asking. |
| JORGE | I'll ask my cousin right now, I'm right here at the house with him. I'll ask him right now and if he—. |

[Voices overlap]

| | |
|---|---|
| JORGE | I'll call you right now. I'll call you. |
| UM-8168 | Where are you? |
| JORGE | Here with Chele. I'm here close to your house. |
| [Pause] | |
| JORGE | Hello? |
| UM-8168 | Uh! In ten minutes then. |
| JORGE | I'll call you back right now. |
| UM-8168 | Ten minutes and if not ask if he wants, wants the nine or the forty. Let me know which one you want. |
| JORGE | Okay, play let me—give me ten minutes. I'll talk to Chele and if he says no, I'll only ask for one. I'll, I'll let you know. |
| UM-8168 | But, but for both, one-thousand two-hundred and he would give it right away. I can even go with you. |
| JORGE | No, no I'll let my cousin know as well so we go. [Pause] |
| UM-8168 | Alright then, let him know. |
| JORGE | Right on, I'll call you back. |
| UM-8168 | Okay, but in ten minutes. |
| JORGE | Okay. |

181.    Based on my training and experience, I believe that on this call JORGE and UM-8168 discussed UM-8168 brokering a sale of firearms to JORGE.  Specifically, I believe that JORGE was discussing purchasing a 9mm handgun and a .40 caliber handgun, because I know based on my training and experience that "9" and "40" are common code words for 9mm handguns and .40 caliber handguns, respectively.  In addition, UM-8168 specifically referred to a price "per caliber," which I believe is a reference to the caliber of the firearms.

182.    A few minutes later, DEA intercepted another call from UM-8168 to JORGE.  On that call, JORGE said he only needed "one."  UM-8168 said that "they" were "clean" and had no

issues, but that the "guy" wanted $780 for one.  JORGE said that UM-8168 had said $1200, and UM-8168 clarified that it would be $1200 for both.  JORGE then put another individual, whom he identified as his cousin "Chele," on the phone to speak with UM-8168.  UM-8168 asked Chele to confirm because UM-8168 wanted to let the "guy" know if it was going to happen or not.  Chele said they (Chele and JORGE) would let UM-8168 know shortly if they could go and take a look at them.  UM-8168 again asked Chele to confirm, and Chele said that "at least one" would happen.  Chele said they would go pick up UM-8168 at his house and then go look at them.  UM-8168 asked if Chele remembered where he lived, and Chele told UM-8168 to text his address to "this number" (the 4817 number).  Based on my training and experience, I believe that on this call JORGE, Chele, and UM-8168 were discussing prices for the two firearms.  I further believe that Chele was telling UM-8168 that he and JORGE would definitely buy at least one of the firearms and that the plan was to pick up UM-8168 and then drive to the seller's home to see the firearms.

183.    Shortly after intercepting the calls described above, SFPD Officers Brenton Reeder and Anthony Scafani, as well as Special Agent Andrew Decker and I, began traveling toward JORGE's residence in San Jose to attempt to disrupt the firearm sale.  While we were driving, DEA intercepted additional calls over JORGE's phone.  On the first of these calls, at 7:37 pm, JORGE called a phone number ending in 3776 ("UM-3776").  Part of their conversation follows:

|  |  |
|---|---|
| JORGE | It's just that we are here right now with Chele.  We talked with, with a cousin of yours there since he has some of those things.  But look, the man wants one-thousand two-hundred for both.  It's a nine and a forty. |
| UM-3776 | [U/I] |
| JORGE | For both, buddy, it is cheap; the problem is that us two with Chele, will not have enough.  If you have money, we will have enough and we can go get them because the guy is waiting for us. |

| | |
|---|---|
| UM-3776 | Are those shits good? |
| JORGE | We are going to go right now to see them first.  That is why I'm telling you, we are going to go do that right now. |
| UM-3776 | And [U/I] at the house? |
| JORGE | Yes, we are here, but we want to leave already because the guy is waiting for us. He just called me again.  And if not, at least we could get one, because we are doing that thing tomorrow buddy, it has been too long already. |
| UM-3776 | Yes, because it's fucked up.  Let's stop messing around, because it's fucked up.  First things first. |
| JORGE | Yes, that is why, because we honestly don't have enough with Chele.  We can come up with enough between all of us. Later you can sell the shit, if you want. |
| UM-3776 | Fuck, but right now, I don't, don't, don't have any money, honestly. |
| JORGE | No, well it would be divided amongst the three of us, and if not we can collect from Shasha.  Shasha has not invested at all, the fucker.  [Clears throat] What's important is that we do that thing, fuck, so look alive. |
| UM-3776 | What? |
| JORGE | What's important is that we do that thing tomorrow. |
| UM-3776 | Well what needs to be done, will be done [U/I]. |
| JORGE | For sure! And where are you right now? We are already on our way there. |
| UM-3776 | You guys are on your way already? |
| JORGE | Yes. |

[Voices overlap]

| JORGE | But I was calling to see if you…yeah, so all three of us could go. |
| UM-3776 | Well…wait for me, I'll go to the house right now. |
| JORGE | Alright, hurry. |
| UM-3776 | Okay. |
| JORGE | Alright. |

184.     Based on my training and experience, I believe that on this call JORGE and UM-3776 were discussing buying firearms and using them in a confrontation with a third party the following day.  In particular, when JORGE said, "[W]e are doing that thing tomorrow, buddy, it has been too long already," and "What's important is that we do that thing tomorrow," I believe based on my training and experience and on surveillance from the following day that he was referring to using the firearms in furtherance of his drug trafficking.

185.     Later that night and over the following day, agents and officers conducted extensive surveillance of JORGE and his associates, including two traffic stops (one of JORGE's truck and one of his associate's car) in an attempt to disrupt any planned violence.  Based on calls intercepted that day, I believe that JORGE and his associates were waiting for a third party to arrive and that they intended to use the firearm(s) in connection with a confrontation with that third party.  However, based on later intercepted calls and surveillance, I do not believe that this confrontation ever occurred, possibly due to the increased law enforcement presence and traffic stops.

**B.     In July 2019, EDUARDO discussed guns with someone in Honduras and then asked that person to murder someone in that country.**

186.     More recently, agents have intercepted several calls that I believe show that EDUARDO uses firearms in connection with his drug trafficking and that he has ordered a murder of an individual in Honduras.

187.     For example, on July 17, 2019, DEA intercepted over EDUARDO's 9477 phone[30]

---

[30] I believe that EDUARDO used this phone because a toll analysis showed that the top callers to EDUARDO's 8938 and 6442 phones stopped communicating with those phones and then starting communicating with the 9477 phone shortly thereafter.  Additionally, the Spanish-speaking monitors inform me that, based on a voice comparison, they believe the same person

a call with a phone that, based on the country code (+504), I believe was based in Honduras. EDUARDO asked the user of that phone ("UM-0199") whether he had a "rifle." UM-0911 said he did not. EDUARDO responded that he (EDUARDO) had a rifle and that UM-0199 just needed to register it under his name. EDUARDO then described a person who "legalizes guns" for EDUARDO. EDUARDO said the man was coming with a "40 Beretta." EDUARDO said that if UM-0199 wanted a rifle, UM-0199 would have to "legalize it" because the firearm "looks like an AK." EDUARDO said the magazine "takes 15" and that he had "another one with 25." The two continued discussing which firearm UM-1099 should get, and EDUARDO said that "people get scared just by looking at them."

188.    Based on my training and experience and knowledge of this investigation, I believe that EDUARDO and UM-0199 were discussing obtaining and using firearms in furtherance of drug trafficking. EDUARDO openly mentioned a "rifle" on this call. When EDUARDO described a person who "legalizes guns" for him, I believe he meant that he worked with someone who could ensure that any firearms they obtained were altered to comply with the law (either Honduran or U.S. law). When EDUARDO mentioned a "40 Beretta," I believe he meant a .40 caliber Beretta handgun. When EDUARDO said that another rifle "look[ed] like an AK," I believe he meant that the firearm resembled an AK-47 assault rifle. When EDUARDO said he had magazines that took "15" and "25," I believe he meant that he had high-capacity magazines that held 15 and 25 rounds of ammunition, respectively. When EDUARDO said that "people get scared just by looking at them, I believe he meant that it was useful to carry firearms in connection with drug trafficking, because other people would be scared just looking at the firearms.

189.    A few days later, on July 20, 2019, DEA intercepted a call over EDUARDO's 9477 phone on which I believe EDUARDO ordered a murder of an individual in Honduras.[31]

---

used all three of these phones. Finally, the context of calls described in this affidavit suggests that EDUARDO is the user of this phone.

[31] Immediately upon intercepting this call, agents shared the contents of the call with authorities in Honduras in an attempt to stop the murder.

Excerpts of that 13-minute call follow:

| | |
|---|---|
| EDUARDO | What is up, buddy? |
| UM-9629 | Well, confirm what is happening, if he is over there, because I am tired, because I recently came down from over there, dude.  If that dude is right there I will [U/I] and I can come back, you get me? |
| EDUARDO | Yeah, that son of a bitch is there, buddy.  He is there but listen, we have not seen him but a new car was inside…he lives with a teacher and there is a new car there.  His snitch just went in the house with a big drink, you get me? Then, that means the guy is inside.  One of our cousins lives next to him that said his dad knew him very well, it's Osman from Tia Juanita. |

190.     I believe based on the context of the remainder of this call, described below, that when UM-9629 asked if "[i]f that due is right there," and when EDUARDO said, "Yeah, that son of a bitch is there, buddy," they were referring to the potential victim and whether he was inside a particular house.  The call continued:

| | |
|---|---|
| EDUARDO | Listen, he lives close to there, my brother spoke to my cousin for him to climb the fence of that house, to see if the dude was inside there.  That son of a bitch has to be there. |
| UM-9629 | Yeah, and [U/I] there. |
| EDUARDO | No, since it is a house and they are neighbors, you get me?  With a strategy, he could pretend to fix the roof shingles or something. |
| UM-9629 | Yeah, for sure. |
| EDUARDO | For sure, you get me? |

191.     I believe based on the remainder of this call, described below, that when

EDUARDO said that his brother had spoken to EDUARDO's cousin "for him to climb the fence of that house, to see if the dude was inside there," he meant that he wanted to have his cousin— who, per the call, is the potential victim's neighbor—climb a fence to peer inside the house and see if the victim was inside.  The call continued:

| | |
|---|---|
| EDUARDO | The only problem is that the bullets, you get me? My brother-in-law already has the R ready, you get me? Everything is ready. The "peines" are ready and everything else but not the bullets.  I cannot find them.  I only have sixty (60) animals of "peines". |
| UM-9629 | Wow. |
| EDUARDO | I have three (3) "peines" but only two (2) are full, you get me? Then other one is empty. |
| UM-9629 | It is empty.  Well, those animals had to be used with enough bullets. You get me? |

[Voices overlap]

| | |
|---|---|
| EDUARDO | Yes. |
| UM-9629 | [U/I] new ones to not mess up. |
| EDUARDO | Yeah, so they do not mess up. |

192.    I believe based on the remainder of the call, described below, that on this portion of the call EDUARDO and UM-9629 were discussing getting bullets to be used to murder the victim.  When EDUARDO said that his "brother-in-law already has the R ready," and that everything was ready "but not the bullets," I believe he meant the rifle was ready and that the only missing piece was the bullets.  When UM-9629 said it should be "new ones to not mess up," I believe he meant that they should use new bullets so they would not jam in the rifle.

193.    The call continued:

| | |
|---|---|
| EDUARDO | That is the only problem. Listen, right there there are two (2) guys and right now another one is coming right now. |

Another guy is coming, you get me?  Those three (3) guys can cover the hill, you get me?  If you come over with another guy and with Mario. You can cover the other exit, by Quema Sombrero (Orica, Honduras). The exit by El Naranjo. These are the only two (2) exits. That guy is not going to come out right now. The guy will come out at night or early morning.

194.    I believe that when EDUARDO said that "there are two guys" and "another one is coming right now," and that "those three can cover the hill," he meant that other associates of his were coming to assist with the murder.  When EDUARDO said that UM-9629 could "cover the other exit," and that "these are the only two exits," he meant that by working with other associates, UM-9629 could cut off any escape route of the potential victim.

195.    Later, the two men said:

EDUARDO        If you can, if you can go now, buddy.  If you can, buddy, you get me? Well, if he comes out good and if he does not, you can go pick up the other thing. Yeah.

UM-9629        For sure, for sure. The house is far and you cannot do it there.

EDUARDO        It is there close to the middle of downtown [sniffles].

UM-9629        Right in the middle of downtown. Yeah...

[Voices overlap]

EDUARDO        Yeah, it is right in the middle of downtown and right there only if you go in through my cousins, going towards the fence and you shoot him, but right there might be problems because it would come from my cousin's house.  It would be too obvious.

UM-9629        Yeah, fuckin' shit . . . .

196.    I believe that when EDUARDO said to "go in through my cousins, going toward the fence and you shoot him," he meant that UM-9629 could go through EDUARDO's cousin's yard (who is the potential victim's neighbor, per the beginning of the call) and shoot the victim that way.  When EDUARDO said "but right there might be problems because it would come from my cousin's house" and that it would "be too obvious," he meant that the assassination could be tied back to him too easily if the murderer came from EDUARDO's cousin's house.

197.    Later, the two men said:

EDUARDO          What I am telling you is to take advantage if you can. Sometimes things to come out good out of the blue. You get me? We know that [U/I] the son of a bitch and that way you can go get your rifle.

UM-9629           Sometimes things one get things that come out of the blue. They come out of nowhere.

        [Voices overlap]

EDUARDO          All of the, all of the sudden.

UM-9629           [U/I].

EDUARDO          I have, I have gotten rid of two enemies like that, all of the sudden. Something that it is not planned and it has gotten done easily.

198.    I believe that when EDUARDO said he had "gotten rid of two enemies like that, all of the sudden," he meant that in the past he was able to bring about the deaths of two individuals when an opportunity arose.

199.    Later, the two men said:

UM-9629           Let's do something, let's do something. Well, I'm here but if for some reason that doesn't happened, I will poke the [U/I] too if you would like.

EDUARDO          For sure. Go ahead, go ahead. You got it. Take the rifle, man, you are going to use it, you get me?

UM-9629           Yeah, I am going to go with a friend and another guy, you get me?

In Re App. for Crim. Complaint              71

And you know that [U/I] over there.

[Voices overlap]

EDUARDO          Listen, listen, I am going to call my dad right now and I am going to call my, I am going to call three other contacts to ask them to have those bullets no matter what, otherwise I am going to get them from their loins, you get me?

UM-9629          Yeah, then I am going to start moving over there.

EDUARDO          Listen, my, my, my brother-in-law is dropping off my sister in Tegu (Tegucigalpa, Honduras) and my nephew. My brother-in-law, I think he is going to be there tonight or before dawn and he is going to be the one giving you that thing. He is going to give it to Mario and Mario is going to give it to you.

UM-9629          Yeah, so then I am going to try to get all the way there to see what to do, because I am going to try to [U/I] and we might not need to [U/I].

EDUARDO          Alright. It's done, it's done and I hope that will get done. I am interested in that son of a bitch of Marlon. Yes.

UM-9629          No man, [U/I].

200.    I believe that when EDUARDO said, "Take the rifle, man, you are going to use it, you get me?" he meant that UM-9629 should use the rifle to murder the victim (possibly the "Marlon" EDUARDO mentioned at the end of this excerpt).

201.    Later on the call, the two men said:

EDUARDO          No, I, I, I was just asking because that guy lived there and you can offer him to make some money, and he might be willing to stab him a couple of times or give him some type of poisonous food.

UM-9629          No, that guy would not do it because [U/I].

EDUARDO          Is he a chicken shit?

| | |
|---|---|
| UM-9629 | [U/I]. He is the type of man that would get in problems like [U/I]. |
| EDUARDO | I heard that his dad [U/I], to Jimmy. |
| UM-9629 | Well… his aunt Mileida's? |
| EDUARDO | Yes. |
| UM-9629 | Well, I do not know why they [U/I] but I have not pay too much attention to that subject. I have not ask them what had happened. |
| EDUARDO | Buddy, do you know anybody there where that man Mei is that would be willing to make a couple of dollars there at [U/I]. If it can be at least to give him [U/I] in coke or to at least stab the son of a bitch a couple of times. |

202.    I believe that when EDUARDO asked whether UM-9629 could "offer him to make some money, and he might be willing to stab him a couple of times or give him some poisonous food," EDUARDO was thinking about other potential ways to murder the victim without the murder being traced back to him, including by paying a third party to stab or poison the victim.

203.    At the end of the call, the two men said:

| | |
|---|---|
| UM-9629 | So then I am going to tell Jimmy to call you so that you can coordinate better. |
| EDUARDO | Tell him, tell him to give me a call. |
| UM-9629 | Yeah, I'll call him right now. |
| EDUARDO | Tell him to give me a call. |
| UM-9629 | I am also going to start moving right now. |
| EDUARDO | Okay then, my friend. Go ahead, go ahead and in the name of God that everything will be fine, you get me? We already know that [U/I] because if he is already going into town that means that death is the best thing for the son of bitch. |

| UM-9629 | Okay, then. |
| EDUARDO | Yeah.  Alright, then. |
| UM-9629 | Okay. |
| EDUARDO | Alright. |

204.    I believe that when EDUARDO said "if he is already going into town that means that death is the best thing for the son of a bitch," he meant that if the potential victim was heading downtown, UM-9629 and his associates should kill the victim.

## VIII.   Seizure of suspected cocaine and heroin from EDUARDO and GONZALEZ

205.    Pursuant to a federal court order, DEA began intercepting communications over EDUARDO's 9477 phone (among others) on July 17, 2019.  Based on my training and experience and knowledge of this investigation, and as explained in more detail below, I believe that EDUARDO and KAREN traveled to Los Angeles on the 17th to pick up a large quantity of drugs and then drove the drugs back to Livermore on the 18th.  On the 19th, ENRIQUE, at EDUARDO's direction, collected about $72,000 in drug proceeds from associates in the Seattle area, which he and GONZALEZ then drove to the Bay Area on the 20th.  I believe based on intercepted calls and a later seizure that EDUARDO then used the drug proceeds to purchase more drugs.  On the 22nd, GONZALEZ and EDUARDO began driving drugs back to the Seattle area, but law enforcement pulled over the truck they were driving and seized a large quantity of suspected cocaine and heroin from a hidden compartment in the vehicle.  EDUARDO, KAREN, ENRIQUE, VICTOR, JORGE, and GONZALEZ later reacted to the seizure on intercepted calls that I believe show that all of them knew that drugs were in the truck.

### A.    On July 17, 2019, EDUARDO traveled to Los Angeles to buy drugs.

206.    On July 17, 2019, DEA intercepted over EDUARDO's 9477 phone calls that, together with location data for EDUARDO's cellphone, I believe show that EDUARDO went to Los Angeles to buy a large quantity of drugs and then brought them back to Livermore, California.

207.    At about 1:13 pm, an unidentified male whose phone number ended in 5082

("UM-5082") called EDUARDO on the 9477 phone. Based on UM-5082's country code (+52), I believe he was calling from Mexico. UM-5082 said that "the guy" said it was a "factory," and was close to where "the guy worked." UM-5082 said for EDUARDO to give UM-5082 a call as soon as EDUARDO arrived, and UM-5082 would have "the guy" come out, or send EDUARDO the number so they could talk. EDUARDO said okay.

208.    At the time of this call, location data for EDUARDO's cellphone showed that it was in West Covina, California, near Los Angeles.

209.    Based on my training and experience and knowledge of this investigation, including later calls intercepted over EDUARDO's phone, I believe that UM-5082 is a Mexican source of supply to EDUARDO and that EDUARDO and UM-5082 were discussing where EDUARDO should meet UM-5082's runner, who was delivering the drugs to EDUARDO.

210.    At about 1:28 pm, UM-5082 said that "he" had not "sent it yet," and EDUARDO told him to hurry. I believe UM-5082 meant that the runner was going to send the address for the meet, because at 1:34 pm UM-5082 sent the following text to EDUARDO: "14500 proctor ave industry ca". I know from Google Maps that this is a Goya Foods warehouse or processing plant. EDUARDO then sent the same address to KAREN.

211.    At about 1:55 pm, EDUARDO called UM-5082 and said he was at the "La Goya" factory. UM-5082 said okay. EDUARDO said there was no parking and told UM-5082 to "tell the guy to come out" and that EDUARDO was in a white Camry. UM-5082 said "he" was on foot but that he would have the "things."

212.    I believe that on this call EDUARDO was telling UM-5082 that he had arrived at the meet location and that UM-5082 should tell his runner to come out with the drugs.

213.    A minute later, UM-5082, who was using a phone number ending in 8960,[32] said that "the dude" would "be there soon." Later in the conversation, EDUARDO said that he was going to his friend's house in Long Beach to ask the friend "to put a clavo" so the friend could

---

[32] I believe that UM-5082 was using this number based on the context of the call and based on a voice identification by the Spanish-language monitors.

get "the stuff" next time.  UM-5082 gave EDUARDO a phone number, which EDUARDO could then be heard repeating to a female (whom he later called "Karen," and who I believe was KAREN[33]) in the background.  EDUARDO could then be heard speaking on another phone on speakerphone, coordinating with a third party (who I believe was UM-5082's runner) about where to meet.  EDUARDO then returned to the call with UM-5082, and UM-5082 said that there should be "six and a little ball," to total "seven."  EDUARDO confirmed that he had received them and that there were seven.  EDUARDO could be heard telling someone that it "does not fit," and then UM-5082 told EDUARDO to "tell the girl to be careful."

214.    I believe that on this call UM-5082 told EDUARDO that his courier would be there soon.  When EDUARDO said that he was going to ask his friend "to put a clavo," he meant that he wanted his friend to add a trap, or secret compartment, to his car so that the friend could deliver the drugs next time; I know that "clavo" is a common code term for a trap.  When UM-5082 said that it should be "six and a little ball," to total "seven," I believe he was referring to the seven packages of suspected heroin seized from EDUARDO and GONZALEZ two days later, one of which was significantly smaller than the others.  Based on a later call discussed below, I believe that when EDUARDO said that they did not "fit," I believe he was telling KAREN that the drugs were not fitting into the trap.

215.    At about 2:08 pm, location data for EDUARDO's phone showed that it was in the lot of the Goya Foods building.

216.    Later that day, at about 7:01 pm, UM-5082 called EDUARDO again. EDUARDO said he was at a friend's house at "Tio Angel."  EDUARDO said "she" was there with him and that "she" was his "*mujer*," which translates to "woman" or "wife."  EDUARDO said he was "going to arrange all of that right now, because one does not fit."  EDUARDO said

---

[33] Agents were not receiving location information for KAREN's phone on this day. Thus, I do not know whether its location data would have shown that KAREN was with EDUARDO at this time.  However, because EDUARDO sent the address for the Goya Foods factory to KAREN moments after receiving it, I believe that she was may have been following EDUARDO in a different car.

he was "going to rearrange everything in a garage right now" because "the thing is not very big, but well fixed, it will fit." EDUARDO said that what he might have to leave behind was the "iron," because it would not fit, but that he had another one "over there" and could pick this one up next time.

217.   I believe that when EDUARDO said he was in "Tio Angel," he meant Los Angeles; location data for his phone showed that it was in the Anaheim area. When he said he was there with his "woman" or "wife," I believe he meant KAREN. When EDUARDO said that he was "going to arrange all of that right now, because one does not fit," I believe he meant that he was trying to fit the drugs in the car's trap but that it was too small to fit all of the packages of drugs. Based on the discussion about trying to fit things into the trap, and because I know that EDUARDO has carried firearms in connection with his drug trafficking, I believe that when he said he might leave the "iron," he meant that a firearm would not fit in the trap along with the drugs.

218.   At about 7:22 pm, EDUARDO spoke with an unidentified male whose phone number ended in 8363. Based on this phone's country code (+52), I believe that the user was in Mexico. EDUARDO asked whether UM-8363 had gotten "that wire transfer," and UM-8363 said yes. EDUARDO said he would send UM-8363 "the other picture" later on.

219.   I believe based on my training and experience and knowledge of this investigation that when EDUARDO said he would send "the other picture," he meant that he would send a picture of the wire-transfer receipt; on other calls that I believe based on context were about money transfers, EDUARDO and UM-8363 discussed whether EDUARDO's nephew (ENRIQUE) had "gotten that done," because UM-8363 had "not received the pictures."

220.   Later on the call, UM-8363 said he had already called "the buddy" and he said he "only had 2 left." UM-8363 said that hopefully "he" (the buddy) could get another and give EDUARDO "the 3." EDUARDO said that his nephew was done gathering all of the money and that they could "do it on Saturday morning." EDUARDO said that UM-8363 knew that EDUARDO was a "constant" and would be "getting some once a week." UM-8363 said yes and

that "he" (the buddy) "gives it up there at 25 and a half," and one could "make a 500 profit."
UM-8363 said he was giving it to EDUARDO at the same price "he" (the buddy) had given them
to UM-8363 for. EDUARDO said okay and that UM-8363 was really helping him out because
he really needed a good price and needed it to be good quality. EDUARDO then said that he
was going to help UM-8363 get "the windows out," because "we always sell plenty of
windows." UM-8363 asked how often EDUARDO was going to need some, and EDUARDO
said they sold about "a whole one every week," but that he also had a brother who got some.

221. I believe that on this call EDUARDO was speaking with another Mexican source
of supply. When EDUARDO asked whether UM-8363 had gotten the wire transfer, I believe he
was asking about whether the UM-8363 had received a payment for drugs. When UM-8363 said
that his "buddy" only had "2" left, I believe he meant that his associate only had two units of an
unspecified drug left. When UM-8363 said that his buddy "gives it up there at 25 and a half," I
believe he was referring to the price of a kilogram of cocaine; I know that the current wholesale
price of a kilogram of cocaine is approximately $26,000. When EDUARDO said that he and
others always sold "plenty of windows," I believe for reasons given above that he meant
methamphetamine. When EDUARDO said that his nephew was done gathering the money, I
believe he meant that ENRIQUE had collected drug proceeds to be used to buy more drugs.
When EDUARDO said that they sold "a whole one every week," I believe he meant that the
Viera DTO distributes at least a kilogram each week. As noted above, I know that the term
"whole one" can refer to different quantities, depending on context; here, based on the fact that
EDUARDO and UM-8363 had just discussed the price of a kilogram of cocaine, I believe
EDUARDO likely was using "whole one" to refer to a kilogram.

222. Location data for EDUARDO's phone showed that it stayed in the Anaheim area
until the following day, July 18, 2019, at which point it began moving north on Interstate 5.

223. At about noon on July 18, 2019, UM-5082 called EDUARDO again. EDUARDO
said he was trying to get some rest because he had left at around 4:30 and had driven "the speed
limit because one chorizo did not fit and so I just brought it like that." EDUARDO said he had

driven at the speed limit and since he had a license there was no problem.

224.    I believe based on my training and experience and knowledge of this investigation that when EDUARDO said that he had driven the speed limit because "one chorizo did not fit," he meant that he had been careful to dive the speed limit since one package of drugs did not fit in the car's trap.  As noted above, the day before EDUARDO had told UM-5082 that one of the packages was not fitting.  In addition, I know that drug traffickers often use out-of-place nouns to refer to drugs because the other person will understand that the out-of-place noun is code for something illicit.  Here, I believe that when EDUARDO mentioned "chorizo" in a call that was not about food, he was were using that out-of-place noun to refer to a package of drugs.

**B.      On July 19, 2019, EDUARDO directed ENRIQUE to collect drug proceeds in the Seattle and drive them to the San Francisco Bay Area.**

225.    On July 19, 2019, at about 12:48 pm, ENRIQUE, using the 7042 number, called GONZALEZ on a number ending in 2978.[34]  At the approximate time of this call, agents saw that the 7042 phone was in Lynnwood, Washington, near Seattle.  ENRIQUE told GONZALEZ to "be ready for today . . . to go down there."  GONZALEZ responded, "To be there at dawn, right?"  ENRIQUE said that he thought so.  GONZALEZ said that it "would be great if it was at dawn because it is getting tough at night."

226.    I believe based on my training and experience and knowledge of this investigation, including physical and electronic surveillance described below, that ENRIQUE was in the Seattle area and was asking GONZALEZ, who I believe also was in the Seattle area, if he was ready to drive from Seattle to EDUARDO's residence in Livermore, California ("down there") in the early morning hours.  I believe that when GONZALEZ said that it "would be great if it was at dawn because it is getting tough at night," he meant that he preferred to leave early in

---

[34] I believe that GONZALEZ used this phone number because on intercepted calls both ENRIQUE and KAREN referred to the user of this phone as "Ale" (which I believe is short for Alexander); because the phone is subscribed to "Gonzalez, AMG Painting LLC," which incorporates GONZALEZ's last name and first initial); and because the phone's subscriber address is 9222 Woodlawn Ave N. in Seattle, Washington, which is GONZALEZ's address of record with the Washington Department of Motor Vehicles.

the morning rather than to drive overnight because there was a higher chance of getting caught at night.

227.    At about 2:03 pm that day (which was a Friday), EDUARDO spoke with an unknown male using a phone number ending in 4355 (UM-4355). UM-4355 said, "[T]he guy told me to, to ask you if, when you will come down with the money." EDUARDO asked who, and UM-4355 said, "the guy with the two halves . . . the one who gave you the two halves." EDUARDO said, "Oh, the, the one who gave me the -- Oh, yeah!  I think [U/I] for next week, by around Monday.  It should be ready by Monday."

228.    I believe based on my training and experience and knowledge of this investigation that UM-4355 was asking EDUARDO, on behalf of a third party who had provided two half-quantities of drugs to EDUARDO, when EDUARDO would be coming with money, either because he wanted EDUARDO to pay for drugs he had already received or to buy more.  As noted, "half" is a common code term to refer to a half-quantity of drugs.  I believe based on later intercepted calls that when EDUARDO said it would be "ready by Monday," he meant that ENRIQUE and GONAZALEZ would be driving the drug proceeds to the Bay Area over the weekend.

229.    At approximately 3:07 pm, EDUARDO called GONZALEZ at the -9619 number. EDUARDO asked if GONZALEZ was "available for tomorrow," and GONZALEZ affirmed. EDUARDO asked if GONZALEZ could "leave around 1 or 2 and arrive here before 7 at night." GONZALEZ agreed.  EDUARDO asked "what car" they would take, and GONZALEZ offered to take whichever EDUARDO wanted.  The two then discussed cars, and GONZALEZ said about one of the cars that he had not driven it, but that "Enrique [had] said the car ran well." EDUARDO acknowledged and said he would have his nephew be ready to come at 2 and to arrive before 7.  Based on the context of this call, I believe that GONZALEZ is a trusted member of the Viera DTO and that EDUARDO was asking for GONZALEZ's assistance in driving with ENRIQUE to California the following day.

230.    Later the same day, at about 5:39 pm, ENRIQUE asked GONZALEZ, "[D]id you

talk to my uncle already?" GONZALEZ said yes and that they were all set. ENRIQUE told

GONZALEZ that he would "try to be there around 1:30." GONZALEZ asked if it would be "in

the car we fixed, right?" ENRIQUE said he thought so.

231.    I believe based on my training and experience and knowledge of this

investigation, including physical and electronic surveillance described below, that ENRIQUE

was asking GONZALEZ whether he had spoken with EDUARDO about the plan to drive the

drug proceeds south to California. I further believe based on my training and experience and the

seizure described below that when GONAZALEZ said it would be in a car that had been "fixed,"

he meant that they would be driving in a car that had been altered to contain a "trap," a secret

compartment used to store contraband.

232.    Shortly thereafter, ENRIQUE spoke with EDUARDO. EDUARDO told

ENRIQUE to "call Juan so you pick up from Juan. Then call Harry so you also pick up from

Harry. Write everything down." EDUARDO then asked if ENRIQUE thought that "everything

fits there, in the small car?" EDUARDO told ENRIQUE that if "that shit does not fit in the

small car, come in the truck." ENRIQUE agreed.

233.    I believe based on my training and experience and knowledge of this

investigation, including calls and surveillance discussed below, that on this call EDUARDO was

instructing ENRIQUE to pick up drug proceeds from individuals supplied by the Viera DTO in

preparation for driving the proceeds to the Bay Area. When EDUARDO instructed ENRIQUE

to "write everything down," I believe he meant that ENRIQUE should note how much money he

had received from each person (including "Juan" and "Harry"), because based on the intercepted

calls described below I believe it was more than $72,000. I believe based on this call and others

described below that when EDUARDO said that if the "shit" did not fit in the small car,

ENRIQUE should take the truck, he was referring to a "trap," or hidden compartment, used to

store drugs or proceeds, and whether the more than $72,000 in drug proceeds would fit inside it.

When ENRIQUE asked if EDUARDO was talking about a problem with the truck that "Ale"

(GONZALEZ's nickname) had mentioned, I believe based on surveillance described below that

he meant GONZALEZ's Chevrolet Silverado.

234.    At about 6:02 pm, EDUARDO called VICTOR and asked if "Chino can get at least one." VICTOR asked, "Of the day kind?" EDUARDO said yes. VICTOR said he would have to call Chino to see what Chino would say. EDUARDO said he had "two already" and that "the guy" had only been able to "set aside two for me." EDUARDO said that he might be buying "a little more than three with all of the paper" he had gathered. VICTOR asked when he should tell Chino, and EDUARDO responded, "For tomorrow at 7." VICTOR acknowledged. EDUARDO said it would be at "7 because the other guy will be leaving early." Later on the call, EDUARDO reiterated his request for VICTOR to "call Chino and see if he can get one." VICTOR said okay. EDUARDO said, "If it's with Chino, that would be better, because the work is good." VICTOR said yes.

235.    I believe that on this call EDUARDO was asking VICTOR whether another brother of theirs (whose nickname is Chino) could get one unit of drugs to go with the two units of drugs EDUARDO was buying from another source. I believe that when EDUARDO said he might be able to buy "a little more than three with all of the paper," he meant that he might be able to afford a little more than three units of a drug with the $72,000 ENRIQUE was about to drive down to him. Based on the seizure described below and on the amount of money I believe ENRIQUE was bringing down from Seattle, I believe that EDUARDO was likely referring to a pound or kilogram quantity. When EDUARDO said that it would be "better" with "Chino" because the "work is good," I believe he meant that Chino provided high-quality drugs.

236.    Later the same night, at about 7:30 pm, ENRIQUE called EDUARDO again and said that he had been to Juan's and Harry's. EDUARDO then said that "Carlos" sold "work," and ENRIQUE acknowledged. ENRIQUE said that "he" (possibly Carlos) had given the "50" that were missing from the other day. EDUARDO said it was "3,250" and that with the "500" that "he" gave, it was $9,850. The two men then said:

EDUARDO            That is it. So go take care of all that there so that you can pick up
                  Ale right at (1:00). Go to his house at one (1:00) so that once…

| ENRIQUE | As soon as I get there, I am going to get everything ready. |
| EDUARDO | [U/I]. |
| ENRIQUE | Mhuhm. |
| EDUARDO | Put them all flat so they would all fit there. |

[Voices overlap]

| ENRIQUE | Yes.  Uh-huh. |
| EDUARDO | Mhum. |
| ENRIQUE | Alright, then.  I will call you later. |
| EDUARDO | Is there, is there a lot of loose bills? |
| ENRIQUE | Uh, uh, there is, there is one dollar bills. I have at home… |

[Voices overlap]

| EDUARDO | A lot? |
| ENRIQUE | I just got more.  Juan was the only one who gave me.  Yeah. |
| EDUARDO | Oh.  Mmmm, but they do fit? |
| ENRIQUE | Yeah Juan, Juan [U/I].  There is a… |
| EDUARDO | Yeah, if there are 100 bills and stuff like that, roll them into a wad because that thing has a hole under… [Snorts] put those there and the flat ones on top. |
| ENRIQUE | I am going to try to arrange everything right there. |

237.    I believe based on my training and experience and knowledge of this investigation that on this call EDUARDO and ENRIQUE were discussing ENRIQUE collecting drug proceeds and packing them in a secret compartment in the car he was using in order to transport the proceeds to the Bay Area.  When EDUARDO mentioned that Carlos sold "work," I believe he meant that Carlos sold drugs, because "work" is a common code term to refer to drugs in general (and "selling" "work" makes little sense).  When ENRIQUE said that "he" had given "50" that was missing from the other time, I believe he meant that Carlos had paid $50 that he had owed from a prior time when ENRIQUE had come to collect.  When EDUARDO told ENRIQUE to

"put them all flat so they would all fit there," I believe that the two were discussing how best to store the money to ensure that it would fit into the hidden compartment. When EDUARDO and ENRIQUE discussed the "loose bills," I believe they were talking about the drug proceeds that ENRIQUE had picked up; I know that drug proceeds are typically in cash, which is more difficult to trace, and that drugs are typically purchased with cash.

238.    At about 11:15 pm, ENRIQUE called EDUARDO and said, "Seventy-two one hundred and five." EDUARDO said yes and asked when ENRIQUE would come. ENRIQUE said that as soon as he was done he would "go try it out there," and that, "if not, it will be in the truck."

239.    I believe based on my knowledge of this investigation that ENRIQUE was saying that he had collected $72,105 in drug proceeds for the drive from Seattle to the Bay Area. When ENRIQUE said that he would "try it out there" and that "if not," it would be "in the truck," I believe he meant that if the $72,105 would fit into the secret compartment in the car discussed above, he would take the car; but that, if it did not fit into that compartment, they would take the truck instead, as EDUARDO had suggested in one of the calls described above.

C.    **On July 20, 2019, ENRIQUE and GONZALEZ drove the drug proceeds from the Seattle area to Livermore.**

240.    In the early morning hours of July 20, 2019, Special Agent Decker was monitoring the physical location of ENRIQUE's phone when, at about 2:00 am, the phone began traveling south on Interstate 5 from the Seattle area.

241.    At about 10:48 am, DEA intercepted a call from ENRIQUE's phone to EDUARDO's phone. However, the Spanish-language monitors determined that GONZALEZ was speaking. GONZALEZ said, "We are in your area already," which I believe meant that GONZALEZ and ENRIQUE were already in California. GONZALEZ then said that they "just had to come up with a different plan on the way back," which I believe was a reference to a return trip to Seattle.

242.    Later in the day on July 20, 2019, agents began surveillance of EDUARDO's

suspected residence on Cherry Blossom Way in Livermore (the "Cherry Blossom House") in anticipation of ENRIQUE and GONZALEZ's arrival. Throughout the day, SA Decker watched the location data for ENRIQUE's phone as it drove towards the Cherry Blossom House.

243.    At about 3:59 pm, EDUARDO received a call from GONZALEZ on a phone with a number ending in 9619.[35] EDUARDO asked what was going on, and GONZALEZ said that he would arrive in 10 minutes. EDUARDO said for GONZALEZ to come through.

244.    About five minutes later, at approximately 4:05 pm, SA Sean Manning watched as a gold Chevrolet Silverado (the "Gold Silverado")[36] drove by his location approximately a half mile from the Cherry Blossom House. A few minutes later, via pole camera, RPD Officer Hoffman watched the Gold Silverado back into the driveway of the Cherry Blossom House. Officer Hoffman saw movement near the passenger side of the truck and then saw a person who appeared to be wearing white clothing and a white hat get out. Officer Hoffman then saw ENRIQUE get out of the driver's side of the Gold Silverado and walk toward the house.

245.    Later that night, at about 5:15 pm, Officer Hoffman saw EDUARDO, GONZALEZ, and ENRIQUE standing in the driveway of the Cherry Blossom House. GONZALEZ appeared to be wearing a white hat.

246.    A few minutes later, KAREN walked down the driveway. KAREN and EDUARDO then walked around the neighborhood; based on intercepted calls,[37] I believe they

---

[35] I believe that GONZALEZ used this phone because the Spanish-language monitors performed a voice comparison and opined that the same person was using the 2978 and 9619 phones. In addition, based on intercepted calls and later surveillance, I believe that GONZALEZ was with ENRIQUE at the time of this call, and I believe based on this call that the caller was with ENRIQUE.

[36] This vehicle is registered to AMG Painting LLC in Seattle, Washington, which is the same information for the subscriber of the 2978 phone.

[37] At about 5:50 pm, DEA intercepted a call on which EDUARDO asked if GONZALEZ saw what kind of car it was. EDUARDO described the car as a four-door green car and said that the occupant was hairy with a green cop hat. EDUARDO asked GONZALEZ to take a picture. Based on my training and experience and knowledge of this case, I believe that EDUARDO and GONZALEZ were discussing counter-surveillance. I know that drug traffickers are vigilant to physical surveillance by law enforcement as a means to evade detection. I believe that when EDUARDO said that the occupant of the green car was wearing a cop hat, he meant that he believed he had seen a car that was a law enforcement surveillance unit. Several seconds later, GONZALEZ called ENRIQUE. On this call GONZALEZ asked ENRIQUE if he had seen a

were conducting counter-surveillance.

247.    Shortly before 8:00 pm, CILDER arrived at the Cherry Blossom House.

248.    About ten minutes after that, VICTOR left the Cherry Blossom House.

249.    Later that night, at about 9:26 pm, EDUARDO spoke with an unidentified male whose phone number ended in 3995 (UM-3995). UM-3995 asked what time "lunch" would be arriving the next day. EDUARDO said, "The lunch will arrive at like seven. I am just waiting to get it right now, and as soon as it is ready, we are going to go at dawn."

250.    Based on my training and experience, surveillance and intercepted calls, and a seizure described below, I believe that EDUARDO was telling UM-3995 that he would be sending drugs up to the Seattle area the following morning and that the delivery would arrive at about 7:00 pm. As noted, drug traffickers often use out-of-place nouns to refer to drugs because the other person will understand that the out-of-place noun is code for something illicit. Here, I believe that when UM-3995 asked about "lunch," and when EDUARDO said he was waiting for it to arrive right then even though it was 9:30 pm, they were using that out-of-place noun to refer to a shipment of drugs.

**D.    In the early morning on July 21, 2019, EDUARDO, KAREN, and ENRIQUE moved from the Cherry Blossom House to a house in Tracy.**

251.    In the early morning hours of July 21, 2019, at about 3:00 am, Officer Reeder saw movement in the driveway of the Cherry Blossom House. Officer Reeder saw the lights flash on the Gold Silverado. He then saw light coming from the screens of three cellphones in the driveway. Officer Reeder saw people moving things, including mattresses, from the garage of the house into a white Camry and the Gold Silverado. A white Toyota 4Runner drove out of the

---

green car. GONZALEZ said the car was a two-door Honda Accord. GONZALEZ then told ENRIQUE to be careful with the truck "because of the plates." GONZALEZ told ENRIQUE to move the truck. Based on my training and experience and knowledge of this case, I believe that GONZALEZ was telling ENRIQUE to be careful with the Silverado. I believe GONZALEZ said this because the Silverado has out-of-state license plates (Washington), which GONZALEZ may have believed would attract greater attention from law enforcement. Physical location data indicated that ENRIQUE's phone was near the Cherry Blossom House. I therefore believe that GONZALEZ was telling ENRIQUE to move the truck away from the house, so as not to draw attention to it.

garage.  Then four vehicles—the Gold Silverado, white Camry, 4Runner, and a black Honda associated with CILDER—drove away from the Cherry Blossom House.

252.    Between 3:45 and 4:00 am, GPS data for EDUARDO's, KAREN's, ENRIQUE's, and CILDER's phones showed that they were traveling to Tracy, California.  VICTOR's phone remained at the Cherry Blossom House.

253.    At about 5:35 am, SA Manning found the Gold Silverado parked in the driveway of a house on Amaretto Drive in Tracy, California (the "Amaretto Drive House").  There were no mattresses in the back of the truck.

254.    At about 8:50 am, GONZALEZ called ENRIQUE and asked if ENRIQUE had slept since the day before.  ENRIQUE said no and that "they" had been "moving."  EDUARDO then came to the phone.  EDUARDO told GONZALEZ they had not slept because they were "moving."  GONZALEZ asked how things were, and EDUARDO said, "Nothing yet," and that the guy that had "the other two things" had not answered.  EDUARDO said he had to get them from a different place and that "it" would not happen until the following morning.  EDUARDO told GONZALEZ to come whenever he wanted, and then they (EDUARDO and GONZALEZ) could send for "it."  EDUARDO then said, "We are in a really clean house."

255.    I believe based on my training and experience and knowledge of this investigation that EDUARDO, KAREN, and ENRIQUE moved from the Cherry Blossom House to the Amaretto Drive House because they were concerned that the Cherry Blossom House had attracted the attention of law enforcement.  I further believe, based on my knowledge of this investigation and on a seizure from the following day, that when EDUARDO told GONZALEZ that the guy that had "the two other things" had not answered, I believe he meant that he had not heard from his source of supply for some of the drugs he intended to buy.  When EDUARDO said that he had to get them from another place and that "it" would not happen until the following morning, I believe he meant that he had to buy the drugs from another source and that they would not begin driving the drugs up to the Seattle area until the next day.  When EDUARDO said that he and the others were in a "really clean house," I believe he meant that the

Amaretto Drive house had not drawn the attention of law enforcement.

256.    Later the same day, VICTOR called CILDER and asked, "How should we do it to wake these people up, because Chino is ready for the other work." CILDER said, "Really?" VICTOR said yes and that he had been calling ENRIQUE but ENRIQUE was not answering. CILDER said he would call ENRIQUE and noted that ENRIQUE might be "really passed out." VICTOR said he would go but that he did not even have the address to go wake them up. VICTOR said that Chino had told him to call and that otherwise Chino was going to say that Chino did not sell anything.

257.    I believe that on this call VICTOR was telling CILDER that he was trying to contact ENRIQUE because Chino was ready to receive drugs for redistribution. I believe that when CILDER said that ENRIQUE might be "really passed out," he meant that ENRIQUE might be asleep due to the early-morning move from the Cherry Blossom House to the Amaretto Drive House.

**E.      On July 22, 2019, officers seized more than 3,800 gross grams of suspected drugs from EDUARDO and GONZALEZ on their way to the Seattle area.**

258.    The next day, July 22, 2019, at about 4:00 am, SA Decker noticed that the location data for GONZALEZ's phone showed that it was moving north out of the San Francisco Bay Area.

259.    At about 12:54 pm, agents and task force officers spotted the Gold Silverado driving north on Interstate 5 in Oregon. The agents and officers maintained surveillance as the truck continued to the Portland area. Eventually, the agents saw that there were two individuals in the truck.

260.    At approximately 6:58 pm, a deputy with the Lewis County Sheriff's Office in Washington State, acting at the direction of DEA agents, conducted an investigative stop of the Gold Silverado on northbound Interstate 5 between mile markers 59 and 60.

261.    The deputy contacted the driver, who provided a Washington State driver's license identifying him as Alexander GONZALEZ-Vasquez. The passenger provided a

Washington State driver license identifying himself as EDUARDO Viera-Chirinos. During this time, a Washington State Trooper brought a narcotics-detecting canine to the exterior of the Gold Silverado. The canine alerted to the presence of a controlled substance near the rear of the cab of the truck, adjacent to the truck-bed toolbox.

262. The deputy notified EDUARDO and GONZALEZ that the truck was being seized. The deputy then transported both GONZALEZ and EDUARDO to exit number 72 from Interstate 5.

263. The deputy seized the Silverado and had it towed to a secured area. DEA Task Force Officer Adam Haggarty obtained a State of Washington warrant to search the Silverado. After obtaining the search warrant, Lewis County Deputies and DEA agents searched the Gold Silverado and located a hidden compartment behind the rear seats of the cab.

264. From this hidden compartment, DEA agents removed two cylindrical plastic packages containing a chunky substance and seven rectangular, cellophane-wrapped plastic packages containing a powdery or malleable substance. Based on their training and experience and the totality of the investigation, the agents believed the packages contained controlled substances. DEA agents later weighed the two cylindrical packages, which had a gross weight, inclusive of packaging, of approximately 1,413 grams. DEA agents also weighed the seven rectangular packages, which had a gross weight, inclusive of packaging, of approximately 2,447 grams.

**F.  EDUARDO, ENRIQUE, KAREN, VICTOR, CILDER, JORGE, and GONZALEZ reacted to the seizure.**

265. At approximately 7:27 pm, EDUARDO called ENRIQUE from a phone number ending in 4021.[38] Before ENRIQUE said hello, EDUARDO could be heard saying, "We are fucked. We are fucked." EDUARDO then said he would send his location and asked ENRIQUE to have "Karen" get a taxi for him. EDUARDO explained, "The police came to drop me off

---

[38] I believe that EDUARDO used this phone based on the context of the call and because the Spanish-language monitors inform me that they believe that the voice on the phone was EDUARDO's.

somewhere over here, and they will come for me because they took my care away from me." ENRIQUE clarified that the police had taken the car, and EDUARDO affirmed. Based on the context of this call, I believe that EDUARDO was telling ENRIQUE about the traffic stop and car seizure.

266.    Immediately after this call, ENRIQUE called KAREN, who asked what "Eduardo" had said. ENRIQUE said that EDUARDO was going to send an address to him and that ENRIQUE was supposed to send a taxi. KAREN asked if "they" took away the car, and ENRIQUE affirmed. KAREN said she could not believe it. ENRIQUE repeated that "they" took away the car and that was all "he" said. Based on the context of the call, I believe that KAREN and ENRIQUE were discussing EDUARDO's call from the 4021 phone.

267.    A minute later, at about 7:29 pm, VICTOR called ENRIQUE and told ENRIQUE to "let me know" because it "seems that this person snitched on us." VICTOR told ENRIQUE that "it" was needed early the next day, not that day. ENRIQUE said he would let VICTOR know. VICTOR said that if not they could get "it" from "Chino."

268.    I believe based on my knowledge of this investigation that when VICTOR said that it seemed that someone had "snitched" on them, he meant that he believed someone had informed law enforcement about the drugs in the Gold Silverado. When VICTOR said that "it" was needed the next day, and that they could get "it" from "Chino," I believe he meant that the load of drugs was supposed to be sold the next day and that they could get more from Chino.

269.    At approximately 7:44 pm, I believe that KAREN, using ENRIQUE's phone, called EDUARDO on the 4021 number. EDUARDO said that a taxi was coming. He said that "they" had dropped him off at some place and that "Ale" was with him. EDUARDO explained that the dog had started scratching and digging "there," and he thought that was why. Based on what I know about the traffic stop, I believe that EDUARDO was describing the fact that a narcotics canine had alerted to the location of the drugs concealed within the Gold Silverado.

270.    At about 7:49 pm, ENRIQUE called EDUARDO and said that he had heard that the "Mexicans were snitching over there." EDUARDO said yeah and that "they had the dogs

smell the car right away." EDUARDO said there was "no problem."

271.    I believe based on my training and experience and knowledge of this investigation that when ENRIQUE said that the "Mexicans were snitching over there," he meant that a competing DTO run by Mexicans was providing information about the Viera DTO to law enforcement.  When EDUARDO said that "they had the dogs smell the car right away," I believe he meant that law enforcement must have known that there were drugs in the car even before he was pulled over.

1.    The next day, July 23, 2019, VICTOR called his brother JORGE and asked if EDUARDO had called.  JORGE said he had not.  VICTOR said that "they" had gotten "busted yesterday over there, entering Seattle."  JORGE said that he did not believe it, and VICTOR explained that they had "[driven] the truck and he was with Ale."  Later on the call, JORGE asked if "they" had "found the work," and VICTOR said "not yet."  VICTOR told JORGE that "the police said the reason for being pulled over was that the car had a report in Richmond, California, and was being investigated."  JORGE said that when they had been arrested, "the car was Mando's and was on the list."  VICTOR said that JORGE's record "showed up too" and asked whether the car "had been under [JORGE's] name."  JORGE said that, after Mando, JORGE had registered it under his name, and "now it was under Ale's name again."  VICTOR said that JORGE needed to tell "them" that JORGE was broke and that was the reason for selling the car.  JORGE agreed, saying that "they could call him," and that the important thing was for "them" to be released.  During the call, VICTOR asked JORGE to wait and said that he was going to call EDUARDO.  VICTOR could then be heard speaking with EDUARDO, seemingly on another phone, and saying, "I have Jorge on the other phone."  VICTOR said that EDUARDO could "tell the police to call [me]" and that he would say he "had to sell the car" and that he "knew Ale for a long time."

2.    I know from my experience in this and other investigation, and from my conversations with other experienced agents, that drug dealers often register cars in other peoples' name to conceal their ties to it.  This is because police can easily run license plate and

registration checks on cars, and a license plate for a car can be easily seen and analyzed by law enforcement. I have seen the Viera DTO follow this pattern; for example, I know that CILDER changed a license plate after he detected the presence of law enforcement. I believe that, on the call with JORGE, VICTOR was describing how the Viera DTO had changed the registration for the Gold Silverado after the state search warrants in July 2018. I further believe that VICTOR was ensuring that JORGE would lie to police if they called to ask about the Gold Silverado.

272. The next day, GONZALEZ, using a phone number ending in 6172,[39] called ENRIQUE and said he was "down because of what happened" and that what had happened was "a serious problem." ENRIQUE said it was "fucked up" and that GONZALEZ was "not going to be able to do that anymore" and that it was better to "retire." ENRIQUE told GONALEZ to "pray to god" that nothing would happen. GONZALEZ asked if ENRIQUE could pay what he owed for the gun, saying that he felt bad about asking but did not have any money. ENRIQUE said he understood.

273. I believe that on this call GONZALEZ and ENRIQUE were talking about how the seizure of drugs was very serious and that they were worried about being arrested. I also believe that GONZALEZ was asking ENRIQUE to pay him back for a firearm he had given ENRIQUE. I further believe that ENRIQUE carried this firearm on the trip from Seattle to the Bay Area, because on intercepted calls ENRIQUE repeatedly mentioned that he had "protection" with him, which I believe was a reference to the firearm.

274. Later on the call, GONZALEZ said that his friend had called the sheriff's department and was told that they (the sheriff's department) did not have anything to do with it and that it was "the three letters," and that it had to do with an investigation that had been going on for a year in Richmond, California. GONZALEZ said he did not know if EDUARDO had already told ENRIQUE, but "they" went straight for the stereo with the dog. GONZALEZ said that a lady had given "the lawyer" the address of the place where the truck was. ENRIQUE

---

[39] I believe that GONZALEZ was using the 6172 phone based on a voice identification by the Spanish-speaking monitors

asked if they had "checked it" already. GONZALEZ said he did not know and that there was still hope and that "they" had not gone to "the house." ENRIQUE said to be hopeful.

275.   I believe that when GONZALEZ said he had learned that it was "the three letters," he meant he had learned that the truck had been pulled over as part of a DEA investigation. When GONZALEZ said "they" had gone straight for the stereo with the dog, he meant that the police must have known there were drugs in the car because they had brought out the drug-detection canine immediately. When ENRIQUE asked if "they" had checked it already, I believe he was asking whether law enforcement had searched the truck. When GONZALEZ said that there was still hope and that "they" had not gone to the house, I believe he meant that there was still hope that law enforcement would not find the hidden compartment in the truck because law enforcement had not searched a residence associated with the DTO.

276.   On July 24, 2019, EDUARDO called KAREN from the 4021 number and said "so many things and [U/I] we have lost" and that "last time it was about 80 cash and today about 24 on top of work." EDUARDO then asked if "Mojarra got the black work." KAREN said no and that he had charged her the 500 that he had lent her. EDUARDO asked whether KAREN and another person (possibly Mojarra) had "[given] the work to Chino," and KAREN said yes, that they had given Chino "that one and also the 200 that [she] owed him."

277.   I believe based on my training and experience and knowledge of this investigation that when EDUARDO said, "So many things and [U/I] we have lost," and that "last time it was about 80 cash and today about 24 on top of work," he meant that law enforcement had seized a large amount of money and drugs from him. Specifically, when EDUARDO said that "last time it was about 80 cash," he was referring to the $79,758 in suspected drug proceeds seized from him during the execution of the state search warrants in June 2018. When he said that "today" it was "about 24 on top of work," I believe he meant that he was owed about $24,000 in drug proceeds from others and that law enforcement had also seized drugs ("work") from him. When EDUARDO asked if Mojarra had gotten the "black work," I believe he was asking whether VICTOR, whose nickname is Mojarra, had gotten the heroin. When KAREN said they had

given the work to "Chino," I believe she meant another brother of EDUARDO, whose nickname is Chino.

## CONCLUSION

278.    I believe based on the foregoing facts that there is probable cause to believe that the Target Subjects have violated 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.


Eric Diamond
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me on July 26 , 2019.


HONORABLE THOMAS S. HIXSON
United States Magistrate Judge